Plaintiff was not simply terminated as assistant supervisor, the position of Chicopee Maintenance Garage assistant supervisor was eliminated due to 2002 budget cuts.

> 1    *Q.   Do you remember having a discussion with him about*
>
> 2  *his position being deleted due to budget cuts, a chance that*
>
> 3  *his position would be deleted?*
>
> 4    *A.   A chance.  That was prior -- that was prior to*
>
> 5  *April.*

(Deposition of Defendant David Theroux, Ex. E, 54:1-5)

> 20    *Q.   Who else was involved in the decision to delete*
>
> 21  *Mr. Bourbeau's position?*
>
> 22    *A.   Within the department?*
>
> 23    *Q.   Anywhere?*

56

> 1    *A.   I guess myself and the Mayor.*
>
> 2    *Q.   Did you have communications with the Mayor*
>
> 3  *regarding this?*
>
> 4    *A.   I mentioned to the Mayor that if he cut 10 to*
>
> 5  *15 percent, that I might lose my assistant.*
>
> 6    *Q.   The Mayor made the decision to cut 10 or*
>
> 7  *15 percent, that's correct?*
>
> 8    *A.   That's correct.*

9    Q. Who made the decision to delete Mr. Bourbeau's

10  position?

11    A. I did.

12    Q. Did you make that decision unilaterally or with

13  discussion with the Mayor and Mr. Merchant?

14    A. Unilaterally.

15    Q. And you have the authority, as a supervisor in the

16  maintenance garage, to terminate an entire position?

17    A. I guess, yes.

18    Q. And you chose to terminate the entire position

19  instead of just giving a layoff due to budget cuts?

20    A. I don't think I had any choice.

21    Q. And when you say that you don't have a choice, you

22  just said it was unilateral; that you made this decision

23  yourself, so clearly you made this choice?

57

1    A.  *To lay Mr. Bourbeau off.*

2    Q.  *To terminate his position?*

3    A.  *To terminate the position for that fiscal year.*

(Deposition of Defendant David Theroux, Ex. E, 55:20-57:3)

20    Q.  *Let's jump now to this, the spring of 02.*

21      *Do you remember when you received the*

22    *termination notice?*

23    A.  *The termination notice itself I think was*

67

1    *June 27th.*

2    Q.  *June 27th of 02?*

3    A.  *Yes.*

4    Q.  *Effective when?*

5    A.  *July first.*

6    Q.  *And do you know whether or not that*

7    *coincided with the new budget, the July first date?*

8    A.  *That was the explanation.*

9    Q.  *When did you first become aware that there*

10    *were going to be budget cuts within the City for the*

11    *following fiscal year beginning July first of 02?*

43

12    *A.    I think in March of 02 it was discussed.*

13    *Q.    Where was it discussed?*

14    *A.    In the Central Maintenance Garage.*

15    *We had all the employees come in the office*

16    *and it was discussed then.*

17    *There was a possibility, basically it was*

18    *not even a possibility of lay-offs.*

19    *It was a let's-make-an-attempt to try to*

20    *save, not to have any lay-offs or anything else.*

21    *That was the idea behind that meeting.*

22    *Q.    So sometime in March?*

23    *A.    Uh-huh.*

68

1    *Q.    Who called the meeting?  David Theroux?*

2    *A.    Yes.*

3    *Q.    Called all the employees in?*

4    *A.    Yes.*

5    *Q.    And essentially said there are going to be*

6    *some budget constraints?*

7    *A.    He said there is a possibility.  They are*

8    *looking at ten to fifteen percent right now.  That was*

9    *a possibility.*

10    *Q.    Was the term lay-offs used?*

44

11    A.    He said that was a possibility I am pretty

12    sure.

13    Q.    And you are clear that was in March

14    sometime?

15    A.    Yes, I think so.  If anything, early March.

16    I am not positive of the date.

17    Q.    Do you remember when you made your first

18    written complaint to anyone at the City with regard to

19    a sexual harassment complaint?

20    A.    I prepared the first complaint or submitted

21    it on April first to Mr. Theroux.

22    Q.    That was after your meeting with respect to

23    the budget cuts?

69

1    A.    Yes.

2    Q.    Did you participate at all in the decision-

3    making process here at city hall with regard to how

4    the budget would be cut?

5    A.    I didn't participate in any budget activity

6    at all especially at Central Maintenance.  I was

7    totally left out.

8    Q.    You never met with the mayor?

9    A.    No.

45

10      *I mean yes, I think the 23rd or 27th of June*

11      *they had a meeting here to explain that there would*

12      *be -- I think it was basically the Union had set*

13      *something up for the people that were going to lose*

14      *their job, half a dozen people that had lost their*

15      *job.*

(Plaintiff's Deposition, Ex. C, 66:20-69:15)

16      *Q.  Is that the grievance you filed with the*

17  *union?*

18    *A.  Yes.*

19    *Q.  And what date did you file it?*

20    *A.  8/20.*

21    *Q.  Did you mention the sexual harassment?*

22    *A.  It doesn't look like it is mentioned*

23  *there.*

*140*

1      *MS. PATRYN:  I'd like to mark that as*

2  *an exhibit as well.*

3

4      *(Defendant's Exhibit No. 3,*
          *offered and marked.)*
5

6    *Q.  After you saw Doctor Sullivan on June 25th,*

7    *2002 did you see anybody in the meantime until you saw*

8    *Doctor Joan Lesser?*

9      *A.    Probably Doctor Koppleman, very likely.*

10     *Q.    Was any situation going on after June 25th,*

11    *2002 that caused you stress beside your work at CMG,*

12    *that situation?*

13     *A.    No.*

(Plaintiff's Deposition, Ex. C, 140:16-141:13)

The position did not remain open, no person was hired to replace Plaintiff, and no applicants were sought to fill that position.

4    *Q.    After fiscal year was over, did you resume that*

5    *position?*

6    *A.    No, I didn't.*

7    *Q.    That position is still not filled?*

8    *A.    Still not filled.*

9    *Q.    Can you do without an assistant?*

10    *A.    Yes.*

(Deposition of David Theroux, Ex. E, 57:4-10)

Even today, more than three years later, the position has not been reestablished.

Because this burden under Plaintiff's *prima facie* case cannot be sustained, summary judgment is warranted for the retaliation claim. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824.

Step Two

Even if a *prima facie* case were presented, the City of Chicopee has articulated legitimate, nondiscriminatory, non-retaliatory reasons for termination. As demonstrated above, the City of Chicopee (and/or Theroux) did not terminate Mr. Bourbeau. His position, assistant supervisor of the CMG, was eliminated entirely. The City had no discriminatory reasons for eliminating that position. Budget cuts in 2002 mandated 10-15 per cent cuts in all departments.

> 1    *Q.  Do you remember having a discussion with him about*
>
> 2   *his position being deleted due to budget cuts, a chance that*
>
> 3   *his position would be deleted?*
>
> 4    *A.  A chance.  That was prior -- that was prior to*
>
> 5   *April.*

(Deposition of Defendant David Theroux, Ex. E, 54:1-5

> 6    *Q.  Were you part of the decision at all to delete*
>
> 7   *Mr. Bourbeau's job?*
>
> 8    *A.  Yes.*
>
> 9    *Q.  You were?  You made those kinds of decisions?*
>
> 10    *A.  Yes.*
>
> 11    *Q.  And even though he was the third or fourth highest*
>
> 12   *ranking city employee, you chose to lay him off and nobody*
>
> 13   *else who had less seniority?*
>
> 14    *A.  True.*
>
> 15    *Q.  And, of course, it had nothing to do with the fact*
>
> 16   *that he complained about your smoking constantly?*

17    A.  No.

18    Q.  Had nothing to do with it?

19    A.  Nothing.

20    Q.  Who else was involved in the decision to delete

21  Mr. Bourbeau's position?

22    A.  Within the department?

23    Q.  Anywhere?

56

1    A.  I guess myself and the Mayor.

2    Q.  Did you have communications with the Mayor

3  regarding this?

4    A.  I mentioned to the Mayor that if he cut 10 to

5  15 percent, that I might lose my assistant.

6    Q.  The Mayor made the decision to cut 10 or

7  15 percent, that's correct?

8    A.  That's correct.

9    Q.  Who made the decision to delete Mr. Bourbeau's

10  position?

11    A.  I did.

12    Q.  Did you make that decision unilaterally or with

13  discussion with the Mayor and Mr. Merchant?

14    A.  Unilaterally.

15    Q.  And you have the authority, as a supervisor in the

49

16  maintenance garage, to terminate an entire position?

17      A.  I guess, yes.

18      Q.  And you chose to terminate the entire position

19  instead of just giving a layoff due to budget cuts?

20      A.  I don't think I had any choice.

21      Q.  And when you say that you don't have a choice, you

22  just said it was unilateral; that you made this decision

23  yourself, so clearly you made this choice?

                                                        57

1       A.  To lay Mr. Bourbeau off.

2       Q.  To terminate his position?

3       A.  To terminate the position for that fiscal year.

(Deposition of Defendant David Theroux, Ex. E, 55:6-57:3)

City employees in various departments were laid off and/or their positions eliminated. The position of assistant supervisor at the CMG was the logical position to eliminate. David Theroux had been the CMG assistant supervisor from 1980 to 1999 (Theroux: 7:8-13). He became supervisor in 1999 (Theroux: 6:4-12). He therefore knew what additional workload he would be taking on. Therefore, the burden of taking back those duties would fall to him who had them previously. And, since he would be determining who to lay off, it was appropriate that he should bear the burden of the extra work load of that layoff. The position was not a critical one. The CMG can do, in fact does, without it. (Ex. E, Deposition of David Theroux 57:9-10). Laying off actual maintenance workers would impair the City's ability to maintain its vehicles, negatively impacting all City departments.

Plaintiff's other alleged acts of retaliation are:

                                                        50

1. That on May 24, 2002, two days after he met with Mr. Rich Merchant of Human Resources to resolve the alleged sexual relationship issues, the locks were changed at the CMG, effectively preventing him from going to work (Complaint ¶¶ 36-38), and

2. That on May 26 he was requested to turn in his pager and the keys to the CMG truck issued to him.

However, Plaintiff went out on sick leave May 7, 2002 until at least June 10, 2002, and the truck was needed by the CMG, and not by him during this period. In addition, during the same period that Plaintiff Bourbeau was out on sick leave, some unknown person was entering the CMG offices at night and removing the property of the Plaintiff Bourbeau. Changing the locks was an appropriate response.

12      *I had been out of work for six, seven days.*

13    *Those were the first days I was out.*

14      *We talked about the situation down there. I*

15    *asked him what he thought I should do, and he said*

16    *well, in order to start any kind of investigation, you*

17    *have to fill out a complaint.*

18      *I asked him if I could take the complaint*

19    *home and think about it.  I was worried about doing*

20    *it.  I didn't just want to do this.*

21      *I went home, filled it out, brought it in*

22    *the next day to his office.*

23      *I think Mr. Merchant was not there that day.*

118

1    *He was at a seminar with Mr. Theroux, and the next*

51

2    *thing I heard was Friday morning to return my truck*

3    *and my pager to the Central Maintenance Garage.*

4        *When I got there, the locks had all been*

5    *changed.*

6    *Q.  Were you out on disability at that time?*

7    *A.  No, I was out sick.*

8    *Q.  So you were out on sick leave?*

9    *A.  Yes. I was only out seven or eight days.*

10   *Q.  When did you first go out?*

11    *A.  I think it was the 9th of May was my last*

12   *day I worked.*

13   *Q.  And when were you due to come back?*

14    *A.  At that point my doctor kept me out for ten*

15   *days and then another ten days when I had a CT scan.*

(Plaintiff's Deposition, Ex. C, 117:12-118:15)

13    *Q.  Was there any reason why you thought you*

14   *should be keeping the City's vehicle and pager?*

15    *A.  Not at all.*

(Plaintiff's Deposition, Ex. C, 119:13-16)

Retrieving pagers and vehicle keys while employees are out on sick leave is nondiscriminatory, and even good business, as is the securing of the offices after hours. The burden on Defendant is not to <u>prove</u> the nondiscriminatory reasons but only to

"produce evidence of a legitimate nondiscriminatory reason." *Sweeney v. Board of Trustees of Keene State College*, 439 U.S. 24, 25, 99 S. Ct. 295, 295 (1978).

It is a burden of production rather than of persuasion, *International Brotherhood of Teamsters v. U.S.*, 431 U.S. 324, 360, 97 S.Ct. 1843, 1846, *Sweeney, McDonnell Douglas*, above, *Runyon,* _____. Budgetary cuts affecting all City departments, and requiring the elimination of the one position in the CMG, are legitimate, nondiscriminatory reasons under federal and Massachusetts law. *Brunner,* 413 Mass., at 700, 603 N.Ed.2d at 206, *Runyon*, at ____. This is particularly true given that the elimination of any other position (actual maintenance workers, CMG secretary, CMG supervisor) would create substantial, severe hardship in the department. *Goldman v. First National Bank of Boston*, 985 F.2d 1113, 1119 (1ˢᵗ Cir. 1993).

The wisdom of these actions is not for the court's consideration, only whether they are non-discriminatory. *Goldman.*

Defendant City, having satisfied its burden of production, Step Three, arises.

Step Three

Under the third step, Plaintiff must present evidence of "specific facts which would enable a jury to find that the reason given was not only a sham, but a sham intended to cover up the employer's real motive: discrimination." *Medina-Nunez v. R.J. Reynolds Tobacco, Inc.*, 896 F.2d 5, 9 (1ˢᵗ Cir. 1990), *Villanueva v. Wellesley College,* 930 F.3d 124, 131 (1ˢᵗ Cir. 1991), *cert. den.*, 502 U.S. 861, 112 S.Ct. 181 (1991).

An employee claiming that the nondiscriminatory reason for adverse employment action is pretextual, is required to show that he was treated differently in all relevant respects from similarly situated non-discriminated persons, and must identify instances of differing treatment in terms of performance, qualifications and conduct without differentiating or mitigating circumstances that would distinguish situations. *Griel v. Franklin Med. Cen.*, 71 F.Supp. 2d 1 (D. Mass. 1999), aff. 234 F.3d 731 (1ˢᵗ Cir. 1999). If Plaintiff cannot sustain this burden of production, summary judgment will be granted to the Defendant. *Medina, Villanueva.*

Plaintiff cannot sustain this final burden. He himself was aware of the fiscal problems burdening the City of Chicopee. (See generally pages 66 through 69 of Plaintiff's deposition testimony on pp. 46 through 49 of this Memorandum, above).

16    *Q.   Do you understand how the lay-off process*

17    *works or worked at CMG or did you understand it?*

18    *A.   No, it wasn't explained.*

19    *Q.   What was your impression of how it worked?*

20    *MR. BLACK: Objection.   You can answer.*

21    *Go ahead.*

22    *THE WITNESS: I was told that there, the*

23    *only, the only thing I was told there was a fifty*

*141*

1    *fifty chance I'd lose my job, and I said how can that*

2    *be?  I have eighteen years of experience, and he said*

3    *they just delete your position.*

4    *That is as far as I know.*

5    *Q.   Who told you that?*

6    *A.   Mr. Theroux.*

7    *Q.   What was your understanding of who is the*

8    *person who would make the decision?*

9    *A.   Mr. Theroux.  He was the appointing*

10    *authority.*

11    *Q.   Is there anyone else that you thought might*

54

12    *have an input into the decision?*

13    *A.   Not that I know of.*

(Plaintiff's Deposition, Ex. C, 140:16-141:13)

## Statute of Limitations:  Counts I, II, III, IV, VIII, IX, X, XI

Each of the above claims is subject to dismissal for all acts, events or circumstances which are allegedly unlawful, and which occurred more than 180 days prior to the bringing of the MCAD/EEOC claims. The period begins to run when Plaintiff first learns of the happening of the allegedly wrongful event or conduct. *Ching v. Mitie Corp.*, 921 F.2d 11, 14 (1990). The claims were brought August 6, 2002. Therefore, any claim for any acts, events or conditions before February 6, 2002 must be denied under M.G.L. c 151 B, and before.

Generally, the events which Plaintiff alleges to be the grounds for his claims in each of these counts began immediately or at least shortly after he began working at the CMG July 17, 2000 (i.e., the sexual relation between Theroux and Cardin, and the smoking). He alleges conditions and events between then and June 27, 2002 as grounds for his claims under Title VII and c. 151B. However, all acts, events or conditions which fell outside the 180 day and 300 day periods are barred as grounds for Plaintiff's claims. Moreover, they cannot be introduced as evidence or considered in support of or corroboration of those acts, events or conditions for which claims were timely filed.

The "continuing violation doctrine" does not preserve Plaintiff's claims. The Supreme Court has recently elaborated on the meaning of the term "continuing violation," holding that a discrete discriminatory act transpires only at the time it takes place, even if it was related to acts that were timely filed. *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 2073, 153 L.Ed.2d 106 (2002). "Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180- or 300- day time period after the discrete discriminatory act occurred." *Morgan,* 122 S.Ct. at 2072. The court made plain that "[d]iscrete acts such as termination, failure to promote, denial of transfer or refusal to hire . . . consitute[] a separate actionable unlawful employment practice." *Id.* At 2073; see also *Landrau-Romero v. Banco Popular DePuerto Rico,* 212 F.3d 607, 612 (1st Cir. 1998)

(holding that even where a plaintiff alleges a violation within the appropriate statute of limitations period, the continuing violation claim will fall if the plaintiff was or should have been aware that he was being unlawfully discriminated against while the earlier acts, now untimely, were taking place) (quoting *Provencher v. CVS Pharmacy, Div. Of Melville Corp.*, 145 F.3d 5, 14 (1st Cir. 1998)); and *Miller v. N.H. Dep't of Corr.*, 296 F.3d 18, 22 (1st Cir. 2002).

CONCLUSION

For the reasons set forth in this memorandum, Plaintiff Alan Bourbeau's Complaint must be dismissed.

THE DEFENDANT
DAVID THEROUX

By:

John A. Cvejanovich, BBO #549285
O'CONNELL, FLAHERTY
& ATTMORE, L.L.C.
1350 Main Street
Springfield, MA 01103
(413) 747-1773 (phone)
(413) 746-1529 (fax)

CERTIFICATE OF COMPLIANCE AND SERVICE

I certify that on **2/23/06** I served the within document, within the time standards provided therefor, on the parties to this action by mailing a copy, postage prepaid, to:

Attorney Alan Jay Black
1383 Main Street
Springfield MA 01103

Attorney William J. O'Grady
Associate City Solicitor
CITY OF CHICOPEE LAW DEPARTMENT
17 Springfield Street
Chicopee MA 01013

John A. Cvejanovich, BBO #549285

56