UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF
MASSACHUSETTS
CIVIL ACTION NO.: 04-30107-KPN

| | |
|---|---|
| ALAN BOURBEAU,<br>Plaintiff<br><br>v.<br><br>CITY OF CHICOPEE, A Municipal<br>Corporation duly established under the<br>Laws of the Commonwealth of<br>Massachusetts,<br>   and<br>DAVID THEROUX in his official<br>Capacity as supervisor of the City of<br>Chicopee's Central Maintenance Garage,<br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF DEFENDANT, DAVID THEROUX IN HIS OFFICIAL CAPACITY AS SUPERVISOR OF THE CITY OF CHICOPEE'S CENTRAL MAINTENANCE GARAGE

**Background**

For the purpose of this motion for summary judgment, the facts (though not the legal conclusions or assertions) are taken as alleged by Plaintiff in his complaint: Paragraphs 4 through 54, which are incorporated herein by reference (Ex. A).

In essence, Mr. Bourbeau asserts that when he began working at the Chicopee Maintenance Garage (CMG), he informed his supervisor, David Theroux, that he had a seizure disorder and requested a non-smoking environment. Despite this request, smoking was permitted, and engaged in by Mr. Theroux and the office secretary, Debra Cardin. Plaintiff also asserts that Theroux and Cardin had an affair, including inappropriate acts in the CMG office. Plaintiff further asserts that in May, 2002 he went

1

out on sick leave and in June, 2002 he was terminated by the elimination of his position at the CMG.

Plaintiff asserts 12 causes of action:

1. Sexual Harassment: 42 U.S.C. § 2000e, *et seq.*
2. Sexual Harassment: G.L. c. 151B §4(16A)
3. Sexual Discrimination: 42 U.S.C. § 2000e, *et seq.*[1]
4. Sexual Discrimination: G.L. c. 151B § 4(16A)
5. Intentional Infliction of Emotional Distress
6. Negligent Infliction of Emotional Distress
7. Violation of Family and Medical Leave Act: 29 U.S.C. 2613
8. Violation of Americans with Disabilities Act: 42 U.S.C. 12101, et seq.
9. Violation of ADA: Lack of Reasonable Accommodation: 42 U.S.C. 12101
10. Handicapped Discrimination: G.L. c. 151B § 1(7)
11. Lack of Reasonable Accommodation: G.L. c. 151 B § 1(17)
12. Retaliation

Plaintiff brought a claim for discrimination pursuant to 42 U.S.C. 2000e and M.G.L. c. 151B before the Massachusetts Commission Against Discrimination (MCAD). The Commission found insufficient evidence of discrimination, and Plaintiff appealed. During the pendency of the appeal Plaintiff withdrew his MCAD claim to pursue a civil suit (Ex. B).

Defendant will demonstrate that he is entitled to summary judgment dismissing each and every count. They will be addressed sequentially.

## Legal Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

---

[1] This title appears to be a misnomer. The body of the count alleges sex-based discrimination by creating disparate conditions, not sexual harassment.

2

judgment as a matter of law." Fed. R. Civ. P. 56(c). Once the moving party asserts "an absence of evidence to support the nonmoving party's case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), the latter must establish the existence of an issue that is both "genuine" and "material," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249-250. Where the non-moving party bears the burden of proof, it may not defeat summary judgment by relying upon mere allegations or evidence that is "merely colorable" or "not significantly probative." *Id.* Rather, the party must produce sufficient admissible evidence to support a jury verdict. *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49-50 (1st Cir. 1990) (plaintiff must refute summary judgment motion by evidence admissible at trial).

### Count I: Sexual Harassment in Violation of 42 U.S.C. 2000e, et seq.

A cause of action for violation for 42 U.S.C. 2000e (Title VII of the Civil Rights Act of 1964) exists generally for sexual harassment as a form of sexual discrimination.

> "In making the determination of whether there was conduct rising to the level of actionable sexual harassment, this Court will be guided, although not bound by, the guidelines promulgated by the Equal Employment Opportunity Commission ("EEOC"), 29 C.F.R. 1604.11. *General Electric Co. v. Gilbert*, 429 U.S. 125, 141-142, 97 S.Ct. 401, 410-411, 50 L.Ed.2d 343 (1976), *reh'g denied*, 429 U.S.11079, 97 S.Ct. 825, 50 L.Ed.2d 799 (1977); *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). *See also Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). The guidelines define actionable sexual harassment as follows:
>
> (a) Harassment on the basis of sex is a violation of § 703 of Title VII. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of

> unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment."

*Morgan v. Massachusetts General,* 901 F.2 186, 192 (1st Cir. 1990). Plaintiff asserts his cause of action under the third category only.

> While some sexual harassment can certainly be equated with employment discrimination within the purview of Title VII, not all sexual harassment is actionable. Under the teaching of *Meritor*, conduct rises to the level of actionable sexual harassment only when it is:
>
>> Sufficiently severe or pervasive "to alter the conditions of [the victim's] employment and create an abusive working environment."

*Meritor Savings Bank v. Vinson,* 477 U.S. at 67, 106 S.Ct. at 2405 (1986) (quoting *Henson v. Dundee,* 682 F.2d 897, 902 (11th Cir. 1982)), *Morgan,* 192.

Plaintiff Bourbeau alleges that an inappropriate relationship between his supervisor, David Theroux, and his co-worker, Debra Cardin, which he witnessed, created an intimating, hostile, and offensive work environment (¶ 57) and a pervasive atmosphere of sexually offensive conduct (¶58). Accepting the events as described by Plaintiff, the conduct is neither sufficiently severe nor adequately pervasive to amount to the type of conduct deemed actionable under Title VII. *Morgan,* 192.

Plaintiff Bourbeau's Complaint itself alleges only generally that an open and offensive sexual relationship exited between Theroux and Cardin. No specific incidents were alleged in the Complaint. He was asked to itemize all such incidents in his deposition taken July 15, 2005. He recounted the following events:

```
10    Q.  Can you tell us the first time that you

11    witnessed or were subjected to any kind of what you

12    would consider to be sexual harassment?

13     A.  I believe in May of 2001 was the first time

14    I walked in on Mr. Theroux and Mrs. Cardin.

15         I think before that I had seen some arm
```

4

```
16   rubbing and back rubbing and touching that seemed
17   inappropriate, but, you know, I just chose not to say
18   anything, but in 2001, on May 26th I think it was -- I
19   don't remember the date -- before Mr. Theroux went on
20   vacation, I think it was April 26th, I walked in and
21   they were embracing and they kissed and I walked right
22   in the middle of it and I walked out.
```

(Plaintiff's Deposition, Ex. C, 41:10-22).

```
15   Q.  And where were they when you walked in?
16   A.  Standing next to his desk.
17   Q.  And what specifically did you see?
18   A.  Them both embracing and he was kissing her.
19   Q.  And what, if anything, did they do when you
20   walked in?
21   A.  They stopped.  I turned around and I left
22   and that was all that took place.
23   Q.  Was his door open or closed?
```

                                                    43

```
1    A.  It was open.
2    Q.  The entire encounter lasted how long?
3    A.  A few seconds that I saw.
4    Q.  And was it discussed at all afterwards?
5    A.  No.
```

    6        *He went on vacation the next day.*

(Plaintiff's Deposition, Ex. C, 42:15-43:6)

    7    *Q. When was the next time that you witnessed*

    8  *any behavior that you would consider to be sexual*

    9  *harassment?*

    10    *A. I think September of 2001. I am positive*

    11  *it was September and we discussed --*

    12    *Q. So five, six months later?*

    13    *A. An incident of that magnitude, yes.*

    14    *I guess there was a lot of touching and*

    15  *back rubbing and that kind of thing. A lot of*

    16  *conversation that was intimate that I was not part*

    17  *of.*

    18    *Q. Let's talk about the touching and back*

    19  *rubbing.*

    20    *A. Uh-huh.*

    21    *Q. Where are you talking about when you say*

    22  *touching?*

    23    *A. The front counter looking out into the*

                     44

    1  *garage, oftentimes they would both be standing there*

    2  *and I would be doing my work and I looked and he had,*

    3  *somebody had their hands on the other one's rear end*

```
 4    or rubbing an arm or that kind of thing.

 5         Q.   How many times did that take place?

 6         A.   I couldn't tell you how many times.

 7    Probably half a dozen times between April and

 8    September.

 9         Q.   And whose hands would be on whose rear end?

10         A.   Mrs. Cardin's on Mr. Theroux's.
```

Plaintiff's Deposition, Ex. C, 43:7-44:10)

```
 6         Q.   And then in September you started to

 7    describe another major incident?

 8         A.   Yes.

 9              In September, and to be totally honest I

10    can't remember exactly what I walked in on, but

11    because there was a few different incidents that I had

12    mentioned here, but this one particular incident I

13    think that was the one I walked in on when they were

14    both sitting behind his desk talking and their hands

15    were on each other.

16              When I walked in the room, they both jumped

17    back and I left.
```

(Plaintiff's Deposition, Ex. C, 46:6-17)

```
11         A.   Mrs. Cardin had her hands in his lap and
```

```
12   they were kind of looking at each other and smiling,

13   and I turned around and left.

14       Q.   When you walked in, they immediately

15   separated?

16       A.   Yes, they jumped.

17       Q.   No conversation?

18       A.   No conversation.
```

(Plaintiff's Deposition, Ex. C, 47:11-18)

```
14       Q.   Was there another incident?

15       A.   Yes, there was. And I can't remember the

16   date.

17            There was another incident, I am guessing at

18   the date, I think it was in November, October.
```

(Plaintiff's Deposition, Ex. C, 49:14-18

```
1             The next time I walked in, he was sitting in

2    his chair, she was sitting on his desk, and she had

3    her feet on his chair.

4             He was backed up against the wall, and again

5    when he saw me, she jumped off the desk and took off

6    down the hall, and we had a meeting soon after that,
```
(Plaintiff's Deposition, Ex. C, 50:1-6)

```
16       Q.   And with this incident that happened, again
```

8

17  *you walked up the hall going to his office, he is*

18  *sitting in his chair at his desk, she is sitting on*

19  *his desk with her foot or feet on his chair?*

20  *A.  Yes.*

21  *Q.  Were they touching each other?*

22  *A.  I don't know. I saw her back, I didn't see*

23  *him.*

51

1  *Q.  And as soon as you walked in, they*

2  *separated?*

3  *A.  Yes.*

4  *Mr. Theroux almost bounced off the wall in*

5  *his chair and she jumped up and took off.*

6  *Q.  Both fully clothed?*

7  *A.  Yes.*

(Plaintiff's Deposition, Ex. C, 50:16-51:7)

23  *Q.  When was the next incident that you found*

52

1  *to be sexually harassing?*

2  *A.  The only thing I can think, I don't know if*

3  *there were any in between that, but again it was in*

9

4   *May of 2002.  I think it was a Thursday.*

5   *Sorry, April of 2002.  It was a Thursday, I*

6   *am guessing around the 26th or 27th of April, the 25th*

7   *maybe.*

8   *I walked in, it was about two o'clock in the*

9   *afternoon to ask a question.*

10  *Q.   Excuse me, what was the date?*

11  *A.   I think the 25th of April.*

12  *Q.   Of 02?*

13  *A.   02, correct.*

14  *Q.   Anything in between?*

15  *A.   There could have.  I don't remember for*

16  *sure.  I don't remember.*

(Plaintiff's Deposition, Ex. C, 51:23-52:16)

1   *Q.   And something happened in April of 02?*

2   *A.   Yes.*

3   *Something happened in April of 02.  I*

4   *walked in at two in the afternoon.  Again they were*

5   *standing up next to the desk.  He was about to kiss*

6   *her, and I walked around the corner.*

7   *I generally made noise, so I wouldn't walk*

8   *in on anything.  I don't know if I did or not that*

9   *time, but I walked around the corner.  They were about*

10

10   to kiss each other. They both saw me. He said

11   something like oh shit, enough.

(Plaintiff's Deposition, Ex. C, 53:1-11)

23        Also in February I think there was an

55

1   incident that I should bring up. And I can't give

2   you the exact date.

3        Q. February of 02?

4        A. Yes. February of 02.

5        They had been having an argument because I

6   had to leave early, five minutes early one day.

7   Mrs. Cardin looked up and said there was a big

8   argument. They both argued for quite a few weeks.

9        During those few weeks Mrs. Cardin showed me

10  a collection of Valentine's Day cards from Mr. Theroux

11  that she had been saving in her drawer.

12       She showed me one of them. It was very

13  intimate, and that is all I saw, and she said there is

14  no way he can get rid of me because I have him right

15  here wrapped around my finger.

16       Q. When you say intimate --

17       A. They were I love you. I don't know. We

11

18    will be together some day or something like that.

19    Q.   And you found that offensive?

20    A.   Yes.

21    Q.   Was there any --

22    A.   I didn't need to see that.

23    Q.   Was there any sexually explicit language in

56

1    the card?

2    A.   No.

3    Q.   Was there any sexually explicit pictures on

4    the card?

5    A.   No.

(Plaintiff's Deposition, Ex. C, 54:23-56:5)[2]

This is the total extent of the conduct, over a period of almost two years, that Plaintiff believes constituted sexual harassment:

17    Q.   Have you described for us at this point all

18    of the conduct that you consider to be the basis for

19    the sexual harassment?

20         Is there any other conduct that you can

21    think of?

---

[2] Plaintiff also asserts that both Theroux and Cardin, as well as others, used vulgar language in his presence, including "f***," but never in a sexually explicit manner directed at him. Vulgar language, no matter how coarse or often used, does not constitute sexual harassment. *Prader v. Leading Edge Prod., Inc.*, 659 N.E.2d 756, 759 (1996).

```
22      A.   I think so, but I am really not sure to be
23   honest with you.
```

(Plaintiff's Deposition, Ex. C, 63:17-23)

*See also* Ex. D, MCAD Complaint.

Plaintiff's assertion that Theroux and Cardin were having a sexual relationship is only his conclusion. The facts upon which he formed this conclusion are legally insufficient to support that conclusion. The relationship alleged by Bourbeau is categorically denied by both Theroux and Cardin, who both claim that their occasional outward affection was due to innocent circumstances [e.g., September 11, (Defendant Theroux's Deposition, Ex. E, 25:23-26:11; Cardin Deposition, Ex. F, 12:23-14:2). However, even accepting Bourbeau's account, as a matter of law the events individually and/or in combination, do not rise to the level of sexual harassment.

First, none of the events, none of the conduct, was directed at Bourbeau. None of it involved substantial sexual activity (rather than affection or simple flirting). By Bourbeau's own account, Theroux and Cardin attempted to keep their relationship private and discreet. In his presence they ceased any affectionate acts. There was no nudity or partial nudity, no kissing, and no activity that would be expected to be offensive to the ordinary person, especially since these isolated incidents took place over a period of almost two years.

The allegations in this case fall far short of the events in *Morgan v. Mass. Gen. Hosp.*, above, which, as a matter of law, were not sufficient to constitute sexual harassment. Given that summary judgment was required there, it is required here.

Similarly, summary judgment was affirmed in *Hopkins v. Baltimore Gas and Electric Co.*, 77 F.3d 745 (4th Cir. 1996), *cert. den.* 117 S.C. 70 under even more offensive conduct actually directed at plaintiff. In *Hopkins*, plaintiff's male supervisor bumped into him, positioned a magnifying glass over his crotch, kissed him at a wedding, and made multiple inappropriate sexual comments to him (e.g., "alone at last" while at the urinal). As a matter of law these events were not sufficiently severe or pervasive to

create an objectively hostile or abusive work environment within the meaning of Title VII, citing *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428 (7th Cir. 1995).[3] Given that the circumstances in this case are less sexually offensive than these circumstances in *Morgan, Hopkins* and *Baskerville*, above, as a matter of law they do not rise to the level of sexual harassment.

### Individual Liability

A manager or supervisor is not personally liable for alleged discrimination under Title VII, including sexual harassment. A supervisor, in his individual capacity does not fall within Title VII's definition of "employer." *Williams v. Banning*, 72 F.3d 552 (7th Cir, 1995), *Tomka v. Seiler Corp.*, 66 F.3d 1295 (2d Cir. 1995), *Seals v. State of Missouri*, 865 F.Supp. 595, *aff.* 91 F.3d 148. Although Title VII includes agent within the definition of the term employer, 42 2000e(b), any agent must be sued only in his capacity as the agent of the employer who <u>alone</u> may be liable for any violation under Title VII. *Hogue v. Roach*, 967 F. Supp. 7 (D.D.C. 1997), (even if employer's CEO personally took discriminatory action against employee, any Title VII claims against the CEO as agent of the plaintiff's employer would merge with the employee's claims against the employer **and any relief awarded would be against the employer alone)**, *Hogue v. Roach*, 697 F. Supp. 7 (D.D.C. 1997)). *Blankenship v. BMI Refractories*, 966 F.Supp. 555 (S.D. Ohio 1997), *Valle v. Johnson Controls World Services, Inc.*, 957 F.

---

[3] The following incidents spread over seven months did not constitute sexual harassment: supervisor called employee "pretty girl"; once, when employee was wearing leather skirt, supervisor made grunting sound that sounded like "um um um"; once when employee commented on how hot his office was, supervisor raised his eyebrows and said "Not until you stepped your foot in here"; once when announcement "May I have your attention" was broadcast over public address system, supervisor said "You know what that means don't you? All pretty girls run around naked"; and when employee asked supervisor whether he had gotten his wife Valentine's Day card, supervisor responded that he should because it was lonely in his hotel room and all he had for company was his pillow and then supervisor looked ostentatiously at his hand and gesture was intended to suggest masturbation. *Baskerville v. Culligan International Co.*, 50 F.3d 428 (7th Cir. 1995).
*Id., Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1366 (7th Cir. 1997) (five sexually-oriented incidents spread over the course of 16 months not sufficiently severe or pervasive enough to create hostile work environment); *Saxton v. Amer. Tel. And Tel. Co.*, 10 F.3d 526, 534 (7th Cir. 1993) (instances of unwanted advances over a two year period, which included the supervisor placing his hand on plaintiff's leg above the knee several times, rubbing his hand along her upper thigh, kissing her for several seconds, and "lurch[ing]" at her from behind some bushes did not create an objectively hostile work environment, citing multiple similar cases).

14

Supp. 1404 (S.D. Miss. 1996) (Manager or supervisor can never be individually liable under Title VII to pay damages for actions taken in his supervisory capacity), *Nelson v. Fleet Nat. Bank*, 949 F. Supp. 254 (D.Del. 1996); *Manns v. Leather Shop*, 960 F.Supp. 925 (D. V.I. 1997).

Theroux was Plaintiff's supervisor and has been sued in that capacity. He cannot be held liable in his individual capacity. Nor can he be held personally or individually liable, even for the acts he is alleged to have committed personally.

Summary judgment dismissing this count against David Theroux is required as a matter of law.

### Count II: Sexual Harassment in Violation of G.L. c. 151B § 4 (16A)

Sexual harassment is considered a form of gender discrimination prohibited under c. 151B § 4 of Massachusetts law. Sexual harassment means unwelcome sexual advances, request for sexual favors and other verbal or physical conduct of a sexual nature if such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or altering the terms or conditions of employment by creating an intimidating, hostile, humiliating or sexually offensive work environment.[4]

For Bourbeau to prove a hostile or sexually offensive work environment under Massachusetts law, he must show: he was subjected to sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; the sexual advances were unwelcome; the conduct was sufficiently severe or pervasive to cause the work environment to become hostile, intimidating, or humiliating to an objectively reasonable person in the Plaintiff's position; and this conduct affected his job performance or altered the conditions of his employment.[5]

Federal decisions give substantial precedential guidance in Massachusetts in determining whether action arises to the level of cognizable harassment under G.L. c. 151 § B4. "In determining whether the alleged conduct was "sufficiently severe and pervasive" the court must consider the conduct both objectively and subjectively. That

---

[4] G.L. c. 151B, § 1 (18)(b); *College-Town, Div. of Interco, Inc. v. MCAD*, 400 Mass. 156, 162 91987); *Ruffino v. State St. Bank & Trust Co.*, 908 F. Supp. 1019, 1036 (D. Mass. 1995).
[5] G.L. c. 151B, § 1(18); *College-Town, Div. of Interco, Inc. v. MCAD*, 400 Mass. 156, 162, 508 N.E.2d 587, 591 (1987); *Ramsdell v. Western Mass. Bus Lines, Inc.*, 415 Mass. 677, 677-79, 615 N.E.2d 195-96 (1993); *Gnerre v. MCAD*, 402 Mass. 1089, 1097-99 (1995).

15

is, "the court must determine whether, in the totality of the circumstances, the alleged [conduct] 'would interfere with [a] hypothetical reasonable individual's work performance and affect seriously the psychological well-being of a reasonable person . . .'" *Lewis v. Gillette Company*, 1993 WL 291____ at *6 (D. Mass. 1993) (citations omitted). Although no particular number of incidents is required, it must be shown that the harassment was sufficiently pervasive to alter the conditions of employment. See *Gnerre v. MCAD*, 402 Mass. 502, 507-08 (1988), *Ramsdell v. Western Mass. Bus Lines*, 415 Mass. 673, 615 NE2d 192 (1993), *College-Town*, above. This standard is legally the same as for Title VII. Therefore, for the reasons set forth with respect to Count I, the events of which Bourbeau complains fail to establish a cause of action.

Individual Liability

G.L. c. 151B, just as Title VII does, limits liability for sexual harassment to the employer and its agent. Again, there is no supervisor individual liability.

**Count III: Sexual Discrimination In Violation of 42 U.S.C. 2000e: Disparate Conditions**

Plaintiff next asserts sexual discrimination by creating disparate conditions of employment based upon Plaintiff's gender (Complaint, ¶62). The alleged conduct was "giving more favorable conditions of employment to Ms. [Debra] Cardin merely due to Mr. Theroux's relationship with Ms. Cardin" (Complaint, ¶63).[6]

As with the alleged sexual harassment, Plaintiff Bourbeau was asked in his deposition to specify all of the alleged instances of disparate treatment. Further, generalized allegations are set forth in Plaintiff's Complaint, ¶¶29, 30, 33). The incidents he recounted were:

```
5    Q.  Did you feel you were in fact being treated

6    differently?

7    A.  Yes.  I was being left out of all kinds of

8    decisions.
```

---

[6] As with Counts 1 above, and 8 below, there is no individual liability for the allegations in this count.

16

> 9   *I was being left out of information; I was*
>
> 10 *not able to answer the phone after a certain period of*
>
> 11 *time. I was told it was not my job to answer the*
>
> 12 *phone, Mrs. Cardin had to answer the phone.*
>
> 13 *Q. She was the clerk?*
>
> 14 *A. She was the clerk, yes, but she was not*
>
> 15 *always in the office and I couldn't tell if she was*
>
> 16 *ever going to answer the phone or not.*
>
> 17   *Many times we would miss calls waiting for*
>
> 18 *her to pick up.*

(Plaintiff's Deposition, Ex. C, 59:5-18)

> 13 *Q. Did you suffer any adverse job action as a*
>
> 14 *result of missing those jobs?*
>
> 15 *A. Yes. As a matter of fact I did.*
>
> 16   *One specific instance was there was, a truck*
>
> 17 *from the waste water department that I had gone to*
>
> 18 *lunch and came back and the truck had been completed*
>
> 19 *and I didn't know about it.*
>
> 20   *And apparently they called looking for the*
>
> 21 *truck a couple of times, and I didn't know this.*
>
> 22   *When it got back from lunch, Mr. Theroux*
>
> 23 *came out*

17

*61*

1   *and started yelling and where the F is this truck*

2   *and somebody better know, and I said gee, nobody*

3   *told me.*

4       *And apparently she is the one that took the*

5   *call. And I did get told. I got really screamed at*

6   *that day for that particular incident.*

7       *And there were many others. You know, I was*

8   *missing parts calls from vendors, specifically*

9   *Tri-County Contractor Supply.*

10      *We had trucks that were down, and she would*

11  *take the calls and not tell me.*

(Plaintiff's Deposition, Ex. C, 60:13-61:11)

22      *I believe that their relationship prevented*

23  *him from letting me discipline her when she didn't do*

*62*

1   *her job.*

(Plaintiff's Deposition, Ex. C, 61:22-62:1)

8       *We had many meetings to try to get her to*

9   *work. She did basically zero work. And I was told by*

10  *Mr. Theroux to leave her alone, I don't bother, I*

18

> 11    don't create a problem with her, she is the way she is
>
> 12    and she is going to stay the way she is.

(Plaintiff's Deposition, Ex. C, 62:8-12)

> 13            There was an incident that was very
>
> 14    uncomfortable that had to do with a police officer in
>
> 15    town.
>
> 16            I was told by Mr. Theroux to protect Mrs.
>
> 17    Cardin from him, Officer Chmura.

(Plaintiff's Deposition, Ex. C, 62:13-63:16)

As a matter of law, these alleged incidents of disparate treatment are insufficient to create a cause of action under Title VII.

Moreover, Plaintiff cannot even prove that the alleged disparate treatment was based upon his gender or any alleged relationship between Theroux and Cardin. Cardin was not the only employee who received preferential treatment from Theroux relative to Plaintiff's treatment. By Plaintiff's own testimony, at least four other employees, all male, received treatment preferential to him.

> 21    A.    There was a good atmosphere, except for
>
> 22    Jeff Hooper, his ability to walk right around me and
>
> 23    go to the secretary or the clerk and get to Mr.

126

> 1    Theroux to try to control what kind of work he got.

19

2  *If he was upset with the type of work he got*

3  *that day, he'd talk to Mrs. Cardin, and Mr. Theroux*

4  *would come out, why does he have to do this, and he'd*

5  *change things around.*

6  *Q. Is there anybody else that --*

7  *A. Mark Boisvere had the ability to come in*

8  *and talk to Mr. Theroux and pretty much lodged*

9  *complaints against the kind of work he was getting*

10  *assigned, and Mr. Theroux would then ask me to give*

11  *him different work.*

12  *That happened quite a few times.*

13  *Mark is, I think is related to Mr. Theroux.*

14  *I think he is his wife's cousin.*

15  *Q. Aside from Mr. Hooper and Mr. Boisvere --*

16  *A. Mr. Hohenberger also did very little work.*

17  *If you look at the maintenance records, he probably*

18  *accumulated about thirty-fifty hours of labor a week.*

19  *He did very little labor. And that was*

20  *because he is one of the older guys in the shop*

21  *and he just really didn't have the ability to do any*

22  *better.*

23  *Okay. He is now I think working and doing*

*127*

1  *my job. I am not sure.*