EXHIBIT "C"

41: PAGES 10 – 13

AND

118: PAGES 11 & 12

Page 1

```
 1
 2              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS
 3
                        C.A. 04-30107-KPN
 4
 5  ALAN BOURBEAU
 6  VS.
 7  CITY OF CHICOPEE
    and DAVID THEROUX
 8
 9
10       DEPOSITION OF: ALAN R. BOURBEAU, taken
11  before Helga Ragle, Shorthand Reporter,
    Notary Public pursuant to the Federal Rules of
12  Civil Procedure, at City Hall, City of
    Chicopee, Chicopee, Massachusetts on July 15,
13  2005, commencing at 9:00 a.m.
14
15
16  APPEARANCES:
17  (See Page 2.)
18
19
20
21
22                  Helga Ragle
                 Shorthand Reporter
23
```

Page 2

```
 1  APPEARANCES:
 2
    ALAN J. BLACK, ESQUIRE,
 3      1383 Main Street, Springfield, MA 01103,
        representing the Plaintiff.
 4
    WILLIAM J. O'GRADY, ESQUIRE,
 5      City of Chicopee Law Department,
        City Hall, Chicopee, MA 01013,
 6      representing the City of Chicopee.
 7  MARY H. PATRYN, ESQUIRE,
        21 Stockbridge Street, Springfield, MA 01103,
 8      representing David Theroux.
 9
    IN ATTENDANCE:  David Theroux
10                  Richard Merchant
11
12
13
14
15
16
17
18
19
20
21
22
23
```

Page 3

```
 1
 2                       I N D E X
 3  ---------------------------------------------
    WITNESSES:        DIRECT  CROSS  REDIRECT  RECROSS
 4  ---------------------------------------------
 5
 6  ALAN R. BOURBEAU    5      76*    184       189*
                              173**            193**
 7
 8  *Ms. Patryn
    **Mr. Black
 9
10  ---------------------------------------------
11  EXHIBITS:         DESCRIPTION           PAGE
12  ---------------------------------------------
13  Defendant 1     sketch                    29
              2     memo of 4/1/02            85
14            3     grievance form 8/20/02   140
              4     application for employment 155
15
16
17
18
19
20
21
22
23
```

Page 4

```
 1
 2               S T I P U L A T I O N S
 3
 4      It is agreed by and between the parties that all
 5  objections, except objections as to the form of the
 6  question, are reserved to be raised at the time of
 7  trial for the first time.
 8
 9      It is further agreed by and between the parties
10  that all motions to strike unresponsive answers are
11  also reserved to be raised at the time of trial for
12  the first time.
13
14      It is further agreed that the deponent will read
15  and sign the deposition and that the filing of the
16  said deposition will be waived.
17
18      It is further agreed by and between the parties
19  that notification to all parties of the receipt of the
20  original deposition transcript is also hereby waived.
21
22                       .....
23
```

Page 17

1 specialist in neurology?
2   A. Yes.
3   Q. Had you ever seen a neurologist before?
4   A. Yes, Doctor Sullivan, John Sullivan. I
5 think he is in Springfield.
6      I had seen him in 1996 for approximately a
7 year, and he released me to Doctor Koppleman's care.
8   Q. And again you saw Doctor Sullivan for the
9 seizure disorder?
10  A. Yes.
11     He was kind of in the hospital, assigned to
12 the hospital when I had the first seizure. He kind of
13 just showed up that night.
14  Q. And as of October of 2003, is that -- what
15 time period are we in when you came to work for
16 Central Maintenance?
17  A. When I came to work was July 17th I believe
18 of two thousand.
19  Q. So in July of two thousand was the seizure
20 disorder the only malady you were treating for
21 regularly?
22  A. Yes.
23  Q. And did that prevent you from taking part

Page 18

1 in any kind of major life activity?
2   A. I was unable to drive for six months.
3   Q. During two thousand?
4   A. Yes, from July, I mean June 17th until
5 January 16th or 17th I started driving.
6   Q. As a result of Doctor Hazratji's order?
7   A. Doctor Hazratji, yes.
8   Q. And where was -- why was it that you
9 couldn't drive?
10  A. Because I had a seizure disorder and I
11 think that is basically a requirement that you don't
12 drive an automobile for six months, depending on how
13 your treatment goes, whether they are successful or
14 not.
15  Q. At some point did he clear you to drive
16 again?
17  A. He had just said six months and I took it
18 upon myself to drive again January.
19     I don't remember the timetable. But I
20 think by then I had started seeing Doctor Sullivan and
21 the driving issue had been past the six month period.
22  Q. So after you began driving again, did your
23 seizure disorder prevent you from taking part in any

Page 19

1 major life activity?
2   A. The seizure disorder itself, no.
3   Q. Had it been controlled by medication at
4 that point?
5   A. Yes.
6   Q. So you were not under any restrictions at
7 work as a result of the seizure disorder?
8   A. Other than driving, that was the only thing
9 I couldn't do.
10  Q. I guess I am talking after you were cleared
11 to drive again?
12  A. After I was cleared to drive, there were no
13 restrictions from my doctor that I could not
14 participate in.
15  Q. Were there any activities that you felt you
16 couldn't participate in, again after you were cleared
17 to drive again?
18  A. No.
19  Q. I think you said when we started this line
20 that you had not mentioned the seizure disorder or any
21 type of restrictions at that first interview?
22  A. Uh-huh.
23  Q. And you had told me I think you had a

Page 20

1 second interview at CMG?
2   A. Correct.
3   Q. Who was the second interview with?
4   A. Mr. Theroux.
5   Q. Just you and he alone?
6   A. Yes.
7   Q. What was the substance of the discussions
8 you had during that second interview?
9   A. We had further discussion on my
10 qualifications and the expectations of the job and the
11 job description.
12     Mr. Theroux then offered me the job and I
13 told him before I would accept the job I needed to
14 tell him something about my medical problem. I
15 explained what it was and that I had a seizure
16 disorder and I was unable to drive for six months,
17 And because that is part of my job description, I
18 wanted to make sure he knew that up front.
19     I was also required to be on call twenty-
20 four hours and I didn't know if I could handle that
21 the first six months. I wanted him to know about
22 that.
23  Q. Did he accommodate the fact that you could

Page 37

1 sleep at night and we were trying to overcome the lack
2 of sleep.
3   Q. When had you started taking it in two
4 thousand?
5   A. In July two thousand or June I believe, and
6 I stopped I think in January, two thousand when I
7 started to see Doctor Sullivan. I kept the
8 prescription up. I believe it was fourteen pills
9 which would last me a few months. I broke them in
10 half.
11   Q. So the Ambien at some point, so I am clear,
12 was prescribed by Doctor Sullivan or --
13   A. No, it was prescribed by Doctor Hazratji
14 originally.
15      I think it may have been him or my PCP,
16 Doctor Koppleman, on his recommendations.
17   Q. And that was to deal with some sleep
18 problems you were having?
19   A. They were concerned that lack of sleep was
20 causing what they call break-through seizures which
21 was something that was tremors.
22      My face would start to shake and lock up,
23 and I had trouble controlling my hands. My right leg

Page 38

1 would go numb, and they were concerned that was
2 break-through seizures and they seemed to be caused
3 when I had a real lack of rest, along with a headache
4 that got real bad.
5   Q. And that was first described sometime in
6 two thousand?
7   A. Yes.
8   Q. And it caused stomach problems?
9   A. Yes. I started to have problems with my
10 stomach.
11      I started taking Prevacid for my stomach.
12   Q. And when did you start taking Prevacid?
13   A. I couldn't tell you positively. I really
14 don't know.
15   Q. Did it seem to coincide with when you
16 started taking the Ambien the first time?
17   A. Oh no. I am sorry, no.
18      I had already had a problem. I had my
19 gallbladder removed in 1999, and afterward if I ate
20 certain foods I have a problem, and I started on
21 Prilosec, and the insurance company said it was too
22 expensive and I started the Prevacid.
23      I did have problems with my stomach, but

Page 39

1 Ambien seemed to increase those problems and they felt
2 it was, although I had a prescription for it, I just
3 don't use it on a regular basis at all.
4   Q. Do the stomach problems predate your
5 employment with the Central Maintenance Garage?
6   A. Yes.
7   Q. And to some degree the sleep problems as
8 well?
9   A. Yes. That was the reason for changing jobs
10 and going on days.
11   Q. And were you also taking Xanax at some
12 point?
13   A. That started in June or July of the year
14 2002 after I left my job.
15   Q. Never took any Xanax or any related
16 medication before?
17   A. No.
18   Q. What was the Xanax for?
19   A. It is to help with anxiety problems. I
20 was having a lot of anxiety problems, unable to make
21 decisions, unable to basically function.
22      Once I found that I had lost my job and was
23 locked out of work, I really had a problem. I had a

Page 40

1 serious problem. And that is when it was prescribed.
2   Q. Up to the point that you lost your job with
3 the City of Chicopee --
4   A. Uh-huh.
5   Q. Did you have any physical conditions which
6 limited your ability to do any major life activity,
7 other than the six-month period when you said you
8 couldn't drive?
9   A. I am not sure I understand.
10   Q. Well, you have described that you have had
11 treatment for seizure disorder?
12   A. Yes.
13   Q. And you have described that you had some
14 stomach problems?
15   A. Yes.
16   Q. And some sleep issues?
17   A. Uh-huh.
18   Q. Have any of those conditions or any other
19 medical condition ever prevented you from taking part
20 in any major life activity prior to the time that you
21 left the City?
22   A. Not that I can think of. Other than the
23 seizures and break-through seizures.

Page 41

1  Q. You have filed a complaint in this case
2  where you have alleged that you were subjected to
3  sexual harassment while at the workplace?
4  A. Uh-huh.
5  Q. And is it fair to say that those
6  allegations of sexual harassment relate to the time
7  that you were employed at the Central Maintenance
8  Garage?
9  A. Yes.
10  Q. Can you tell us the first time that you
11  witnessed or were subjected to any kind of what you
12  would consider to be sexual harassment?
13  A. I believe in May of 2001 was the first time
14  I walked in on Mr. Theroux and Mrs. Cardin.
15     I think before that I had seen some arm
16  rubbing and back rubbing and touching that seemed
17  inappropriate, but, you know, I just chose not to say
18  anything, but in 2001, on May 26th I think it was -- I
19  don't remember the date -- before Mr. Theroux went on
20  vacation, I think it was April 26th, I walked in and
21  they were embracing and they kissed and I walked right
22  in the middle of it and I walked out.
23  Q. Let's talk a little bit about that

Page 42

1  incident.
2     When you say you walked in, where did you
3  walk in to?
4  A. Into Mr. Theroux's office.
5
6     (Witness looking at diagram.)
7
8     I can't read my own writing.
9     His office is here. I was out here, so I
10  walked down the hall to ask him a question or whatever
11  and walked in on them in here.
12
13     (Witness indicating on diagram.)
14
15  Q. And where were they when you walked in?
16  A. Standing next to his desk.
17  Q. And what specifically did you see?
18  A. Them both embracing and he was kissing her.
19  Q. And what, if anything, did they do when you
20  walked in?
21  A. They stopped. I turned around and I left
22  and that was all that took place.
23  Q. Was his door open or closed?

Page 43

1  A. It was open.
2  Q. The entire encounter lasted how long?
3  A. A few seconds that I saw.
4  Q. And was it discussed at all afterwards?
5  A. No.
6     He went on vacation the next day.
7  Q. When was the next time that you witnessed
8  any behavior that you would consider to be sexual
9  harassment?
10  A. I think September of 2001. I am positive
11  it was September and we discussed --
12  Q. So five, six months later?
13  A. An incident of that magnitude, yes.
14     I guess there was a lot of touching and
15  back rubbing and that kind of thing. A lot of
16  conversation that was intimate that I was not part
17  of.
18  Q. Let's talk about the touching and back
19  rubbing.
20  A. Uh-huh.
21  Q. Where are you talking about when you say
22  touching?
23  A. The front counter looking out into the

Page 44

1  garage, oftentimes they would both be standing there
2  and I would be doing my work and I looked and he had,
3  somebody had their hands on the other one's rear end
4  or rubbing an arm or that kind of thing.
5  Q. How many times did that take place?
6  A. I couldn't tell you how many times.
7  Probably half a dozen times between April and
8  September.
9  Q. And whose hands would be on whose rear end?
10  A. Mrs. Cardin's on Mr. Theroux's.
11  Q. And would it be resting there or?
12  A. It would be more like a rubbing type of
13  thing and touching.
14  Q. Anything said?
15  A. A lot of times yes, can I get you a coffee,
16  hon.
17     That was the kind of conversation that took
18  place.
19  Q. And did you find that to be offensive?
20  A. Yes.
21  Q. Did you say anything?
22  A. No. I just ignored it and left, usually
23  went out into the shop.

Page 45

1  Q. Was anything directed at you?
2  A. No, not at that time.
3  Q. So you witnessed some conduct, some
4  inappropriate touching between Theroux and Cardin that
5  you would witness, that you would see?
6  A. Yes.
7  Q. And nothing was discussed about it?
8  A. Not at that time.
9  Q. Not at that time, okay.
10     The next thing was I think what you
11 described as a major incident took place in
12 September?
13  A. Correct.
14  Q. So that there was an incident in Theroux's
15 office in late April, early May of 2001, correct?
16  A. Yes.
17  Q. Where you walked in and they were hugging
18 and kissing?
19  A. Yes.
20  Q. And you saw some inappropriate touching
21 primarily at the counter?
22  A. No. Yes. The stuff we were just talking
23 about, that was at the counter or down the hall

Page 46

1 looking out the window or his door into the parking
2 lot, in the copy room, in the coffee area.
3  Q. I think you told me that you saw about five
4 or six incidents between May and September?
5  A. Correct, different locations in the office.
6  Q. And then in September you started to
7 describe another major incident?
8  A. Yes.
9     In September, and to be totally honest I
10 can't remember exactly what I walked in on, but
11 because there was a few different incidents that I had
12 mentioned here, but this one particular incident I
13 think that was the one I walked in on when they were
14 both sitting behind his desk talking and their hands
15 were on each other.
16    When I walked in the room, they both jumped
17 back and I left.
18  Q. Let me ask you: They were both sitting
19 where?
20  A. Side by side behind his desk.
21  Q. Were there two chairs there?
22  A. Correct.
23  Q. And this was another incident you walked up

Page 47

1 the hall to go into Theroux's office?
2  A. Yes.
3  Q. Was the door open?
4  A. Door open.
5  Q. Did you ever hear any conversation?
6  A. No.
7  Q. And as you turned the corner, they were
8 sitting next to each other?
9  A. Yes.
10  Q. And what specifically were they doing?
11  A. Mrs. Cardin had her hands in his lap and
12 they were kind of looking at each other and smiling,
13 and I turned around and left.
14  Q. When you walked in, they immediately
15 separated?
16  A. Yes, they jumped.
17  Q. No conversation?
18  A. No conversation.
19     And she went to her desk out in front which
20 is back against the wall and I left.
21  Q. Was that discussed at all?
22  A. The next day, yes.
23  Q. And tell me what the discussion was and

Page 48

1 with whom?
2  A. I came in at 6:30 and talked with Mr.
3 Theroux about it.
4     Listen, I said, what happened yesterday
5 can't continue to happen. These things have been
6 going on for a few months now, and I am not going to
7 put up with it in a place of work, and it is just not
8 right, it is inappropriate.
9     He said he was sorry, it wouldn't happen
10 again. He said it just kind of happened and that was
11 the end.
12    That was the end of the conversation.
13  Q. When you say that you walked in and she had
14 her hands on his lap, they were fully clothed?
15  A. Yes.
16  Q. And what you witnessed, did they
17 immediately jump up and separate?
18  A. Yes.
19  Q. And is that something that you considered
20 to be more egregious if you will than what you had
21 seen at the counter?
22  A. Yes.
23  Q. And in what way?

Page 49

1  A. The fact that where she had her hands and
2 the fact they jumped so quickly. It was pretty
3 obvious that something was going on because she got up
4 and ran out of the room and went to her desk and there
5 was no conversation with me or anybody the rest of the
6 day.
7  Q. If she had not run out of the room, would
8 it not have been as obvious?
9  A. I think that attitude, but what -- I saw
10 what I saw, it didn't change what I saw.
11  Q. And you talked to David Theroux, he
12 apologized and said it wouldn't happen again?
13  A. Uh-huh.
14  Q. Was there another incident?
15  A. Yes, there was. And I can't remember the
16 date.
17     There was another incident, I am guessing at
18 the date, I think it was in November, October.
19     I am sure it is written in the documentation
20 I gave you, and I could be getting these incidents
21 mixed up.
22  Q. I understand it has been a long time.
23  A. Yes.

Page 50

1     The next time I walked in, he was sitting in
2 his chair, she was sitting on his desk, and she had
3 her feet on his chair.
4     He was backed up against the wall, and again
5 when he saw me, she jumped off the desk and took off
6 down the hall, and we had a meeting soon after that,
7 and we discussed that between the three of us, and I
8 told them at the time, look, I don't care what you
9 folks do, it is your business, but not here and not
10 with me having to put up with this.
11     And really I did all the talking and when
12 the meeting was over, I walked out and it was over
13 with.
14     There was no sorry, it won't happen again,
15 none of that stuff.
16  Q. And with this incident that happened, again
17 you walked up the hall going to his office, he is
18 sitting in his chair at his desk, she is sitting on
19 his desk with her foot or feet on his chair?
20  A. Yes.
21  Q. Were they touching each other?
22  A. I don't know. I saw her back, I didn't see
23 him.

Page 51

1  Q. And as soon as you walked in, they
2 separated?
3  A. Yes.
4     Mr. Theroux almost bounced off the wall in
5 his chair and she jumped up and took off.
6  Q. Both fully clothed?
7  A. Yes.
8  Q. And you didn't hear any conversation?
9  A. No, no.
10  Q. And you had a meeting about it?
11  A. Yes.
12     I think the meeting was about other issues
13 also. Because at that point Mrs. Cardin and myself
14 were supposed to be working together. She was -- I
15 was her supervisor. And we were not speaking, we
16 were -- the work situation was terrible.
17     I didn't get messages, none of these things
18 were happening.
19     The meeting was about that, trying to get
20 this place a little bit working together, and I also
21 brought that up at the same time.
22     That was the reason I wanted the meeting.
23  Q. When was the next incident that you found

Page 52

1 to be sexually harassing?
2  A. The only thing I can think, I don't know if
3 there were any in between that, but again it was in
4 May of 2002. I think it was a Thursday.
5     Sorry, April of 2002. It was a Thursday, I
6 am guessing around the 26th or 27th of April, the 25th
7 maybe.
8     I walked in, it was about two o'clock in the
9 afternoon to ask a question.
10  Q. Excuse me, what was the date?
11  A. I think the 25th of April.
12  Q. Of 02?
13  A. 02, correct.
14  Q. Anything in between?
15  A. There could have. I don't remember for
16 sure. I don't remember.
17     There was a big argument in February; they
18 really seemed kind of distant for a month or so.
19  Q. When you say big argument, they seemed to
20 have a big argument?
21  A. Yes.
22  Q. David and Debra?
23  A. Yes.

Page 53

1  Q. And something happened in April of 02?
2  A. Yes.
3     Something happened in April of 02. I
4  walked in at two in the afternoon. Again they were
5  standing up next to the desk. He was about to kiss
6  her, and I walked around the corner.
7     I generally made noise, so I wouldn't walk
8  in on anything. I don't know if I did or not that
9  time, but I walked around the corner. They were about
10 to kiss each other. They both saw me. He said
11 something like oh shit, enough.
12    She had a pile of paperwork that she picked
13 off the desk in her hand as she was leaving he knocked
14 it out of her hands and he said don't ever do that
15 again and she left and he left for the day.
16 Q. Let me get this straight:
17    You walk into his office?
18 A. Yes.
19 Q. They are standing facing each other?
20 A. Yes.
21 Q. They are not touching each other?
22 A. His hands were on her hips.
23 Q. She is holding a pile of paperwork?

Page 54

1  A. A pile of paperwork like this.
2  Q. They are not kissing?
3  A. They were this far away, an inch away.
4  Q. And you anticipated that they were about to
5  kiss?
6  A. Yes.
7  Q. They don't kiss?
8  A. They stop when I walk around the corner.
9  Q. And they separate?
10 A. They separate.
11 Q. Mr. Theroux knocks the paperwork out of her
12 hands, says don't do it ever again.
13 A. She was extremely embarrassed, she went
14 down the hall to her desk, and he walked out the front
15 door and left and didn't come back.
16 Q. And you found that to be upsetting?
17 A. Yes.
18    Mrs. Cardin didn't come to work the next
19 day.
20    I had no idea she was not coming in. I
21 think she took a personal day, and Mr. Theroux left
22 the next day to go on vacation for a week.
23    Also in February I think there was an

Page 55

1  incident that I should bring up. And I can't give
2  you the exact date.
3  Q. February of 02?
4  A. Yes. February of 02.
5     They had been having an argument because I
6  had to leave early, five minutes early one day.
7  Mrs. Cardin looked up and said there was a big
8  argument. They both argued for quite a few weeks.
9     During those few weeks Mrs. Cardin showed me
10 a collection of Valentine's Day cards from Mr. Theroux
11 that she had been saving in her drawer.
12    She showed me one of them. It was very
13 intimate, and that is all I saw, and she said there is
14 no way he can get rid of me because I have him right
15 here wrapped around my finger.
16 Q. When you say intimate --
17 A. They were I love you. I don't know. We
18 will be together some day or something like that.
19 Q. And you found that offensive?
20 A. Yes.
21 Q. Was there any --
22 A. I didn't need to see that.
23 Q. Was there any sexually explicit language in

Page 56

1  the card?
2  A. No.
3  Q. Was there any sexually explicit pictures on
4  the card?
5  A. No.
6  Q. Did either one of them ever use any
7  sexually explicit language in front of you?
8  A. Yes.
9  Q. Tell me about that.
10 A. I would say more vulgar language, not
11 sexually explicit.
12 Q. Like what?
13 A. A lot of the F word was used, a lot of --
14 how do I explain it? A lot of vulgar language
15 constantly every day by both of them. Okay.
16 Having to do with someone's rear end, that kind of
17 stuff.
18    I don't know how to explain it to you. I
19 am sorry.
20 Q. I guess they used a lot of vulgar language?
21 A. Uh-huh.
22 Q. They used the F word?
23 A. Yes.

Page 57

1  In front of both male and female people that
2  came in and out of the office.
3    Q. Did other people in the shop use vulgar
4  language?
5    A. A couple of people did.
6       Not in the main office, but a couple did,
7  yes.
8    Q. There was never sexually explicit language
9  directed at you?
10   A. No, but Mrs. Cardin tried to rub my back a
11 few times.
12      I asked her to please stop and I did mention
13 that a couple of times to Mr. Theroux.
14   Q. And did she stop?
15   A. I don't know if she stopped because he said
16 something or we didn't get along at all, so that
17 was --
18   Q. When you say she tried to rub your back,
19 what happened?
20   A. All the filing cabinets were down on the
21 floor.
22      If I bent down to do something in the filing
23 cabinet, she'd walk up behind me, a lot of times with

Page 58

1  people in the room waiting to get information from me,
2  and started to rub my back and rub my arm.
3       I said please don't put your hands on me, I
4  don't like that.
5    Q. And did she stop?
6    A. She stopped, got really insulted and didn't
7  talk for a day or so.
8       I asked Mr. Theroux to have her stop that.
9    Q. Any other incident that you can describe
10 for us that took place in David Theroux's office?
11   A. Other than a few times going down the hall
12 looking for Mr. Theroux and not being able to find the
13 two of them, but hearing noises in his private lav,
14 but it was behind the door, I have no idea.
15   Q. You don't know what was going on?
16   A. No, I have no idea.
17   Q. Any other behavior other than what you
18 have described that you found as being sexually
19 harassing?
20   A. Other than the fact that I felt if I
21 complained about all this stuff, that I was being
22 treated much differently than I had the first eight or
23 nine months that I worked there.

Page 59

1    Q. When you say other than fact that you
2  felt -- well, did you do anything or strike that.
3       After you complained --
4    A. Yes.
5    Q. Did you feel you were in fact being treated
6  differently?
7    A. Yes. I was being left out of all kinds of
8  decisions.
9       I was being left out of information; I was
10 not able to answer the phone after a certain period of
11 time. I was told it was not my job to answer the
12 phone, Mrs. Cardin had to answer the phone.
13   Q. She was the clerk?
14   A. She was the clerk, yes, but she was not
15 always in the office and I couldn't tell if she was
16 ever going to answer the phone or not.
17      Many times we would miss calls waiting for
18 her to pick up.
19   Q. Who told you not to pick up the phone?
20   A. Mr. Theroux did.
21   Q. In the context of what? That it was not
22 your job to answer the phone?
23   A. That it was not my job, that it was her

Page 60

1  job.
2    Q. That it was hers?
3    A. When she was not there, I was able to
4  answer the phone.
5       Again the problem being that messages were
6  not getting through. We did have a meeting about all
7  this.
8       We had trucks that were down on the road for
9  hours because I didn't get the messages. She was
10 spending the day in his office and was obviously
11 taking the message three hours earlier and that was a
12 problem.
13   Q. Did you suffer any adverse job action as a
14 result of missing those jobs?
15   A. Yes. As a matter of fact I did.
16      One specific instance was there was, a truck
17 from the waste water department that I had gone to
18 lunch and came back and the truck had been completed
19 and I didn't know about it.
20      And apparently they called looking for the
21 truck a couple of times, and I didn't know this.
22      When it got back from lunch, Mr. Theroux
23 came out

Page 61

1 and started yelling and where the F is this truck
2 and somebody better know, and I said gee, nobody
3 told me.
4     And apparently she is the one that took the
5 call. And I did get told. I got really screamed at
6 that day for that particular incident.
7     And there were many others. You know, I was
8 missing parts calls from vendors, specifically
9 Tri-County Contractor Supply.
10     We had trucks that were down, and she would
11 take the calls and not tell me.
12   Q. You were clearly unhappy with her
13 performance as a clerk?
14   A. Correct.
15   Q. And her performance or lack thereof with
16 respect to her being a clerk --
17   A. Uh-huh.
18   Q. Existed whether or not you were offended
19 by any conduct she had with David Theroux or not,
20 right?
21   A. I don't know that.
22     I believe that their relationship prevented
23 him from letting me discipline her when she didn't do

Page 62

1 her job.
2     In fact I wrote more than one memo to Mr.
3 Theroux and Mrs. Cardin about her performance.
4     In fact there was one written with regard to
5 not smoking that was just ignored, never even brought
6 up.
7     I wrote many memos.
8     We had many meetings to try to get her to
9 work. She did basically zero work. And I was told by
10 Mr. Theroux to leave her alone, I don't bother, I
11 don't create a problem with her, she is the way she is
12 and she is going to stay the way she is.
13     There was an incident that was very
14 uncomfortable that had to do with a police officer in
15 town.
16     I was told by Mr. Theroux to protect Mrs.
17 Cardin from him, Officer Chmura.
18   Q. When was that incident?
19   A. That happened over and over again.
20     When he came in the building, I was supposed
21 to lock the door and not let him in the office where,
22 near where she was.
23     In fact I was supposed to put myself

Page 63

1 between him and her for some reason.
2     I told him he needed to call the police
3 chief and get it straightened out. It was not my job
4 to protect her, and I was really really worried.
5     I got in trouble twice because I didn't
6 protect her from this guy.
7     Apparently she had had some kind of
8 relationship with this fellow in the past, and he
9 didn't want him near her.'
10     It was to the point where I physically had
11 to stand between him and her. I did that once, and I
12 said not any more; that is it.
13     I got in some serious trouble a couple of
14 times because I didn't lock the door on him. That
15 kind of thing.
16     So that is just another incident.
17   Q. Have you described for us at this point all
18 of the conduct that you consider to be the basis for
19 the sexual harassment?
20     Is there any other conduct that you can
21 think of?
22   A. I think so, but I am really not sure to be
23 honest with you.

Page 64

1     I don't have all this documentation I went
2 through.
3   Q. Clearly you filed a complaint back in 2002
4 with the Massachusetts Commission Against
5 Discrimination?
6   A. Correct.
7   Q. And the substance of that complaint was
8 that you were the subject of sexual harassment while
9 at CMG?
10   A. Correct.
11   Q. And you described in that complaint with
12 the MCAD the basis for that allegation --
13   A. Yes.
14   Q. For that allegation, did you not?
15   A. Yes.
16   Q. Did you include in that complaint anything
17 you could think of at the time that would form the
18 basis for the sexual harassment?
19   A. In my original it was fourteen pages long;
20 they asked me to shave it down to just a couple of
21 pages. It would have been too tough to read.
22   Q. Where are the fourteen pages?
23   A. In the original fourteen pages I did.

Page 65

1  Q. Where is that?
2  A. I am sure I still have it. I don't know if
3  Attorney Black has it.
4  Q. At some point in time there was fourteen
5  pages of allegations that you presented to the
6  Massachusetts Commission Against Discrimination.
7  A. Yes, fourteen pages of my daily notes and
8  anything else that I composed of what I felt took
9  place, and it was shave down to a couple of pages.
10  Q. And you think those fourteen pages may
11  still exist somewhere?
12  A. I am sure that they do. I don't know
13  whether or not the MCAD has that or what, but --
14      MR. O'GRADY: Can we agree that you
15  will look for them.
16      MR. BLACK: I can get it to you. I have
17  to look if I have it. The file is huge, so I am not
18  sure what he is referring to.
19      THE WITNESS: From those fourteen pages
20  it would have been boiled down to this.
21  Q. Let me show you a document and ask you if
22  you recognize that?
23

Page 66

1      (Witness examining document.)
2
3  A. Yes. Can I turn the page to see how much
4  of it is there?
5  Q. Sure.
6  A. Yes, I think this is -- I went to the MCAD
7  and showed them my information. They said you really
8  need to shave this down.
9      I went back and finally put it in two pages
10  and gave it to them. Probably it was two hours of
11  work to do this, so it was not in any way, you know,
12  real detailed.
13  Q. And what you are looking at now, that is
14  the complaint you filed with the MCAD?
15  A. Yes.
16  Q. A copy of it?
17  A. Sure.
18      MR. O'GRADY: I am not going to mark
19  this.
20  Q. Let's jump now to this, the spring of 02.
21      Do you remember when you received the
22  termination notice?
23  A. The termination notice itself I think was

Page 67

1  June 27th.
2  Q. June 27th of 02?
3  A. Yes.
4  Q. Effective when?
5  A. July first.
6  Q. And do you know whether or not that
7  coincided with the new budget, the July first date?
8  A. That was the explanation.
9  Q. When did you first become aware that there
10  were going to be budget cuts within the City for the
11  following fiscal year beginning July first of 02?
12  A. I think in March of 02 it was discussed.
13  Q. Where was it discussed?
14  A. In the Central Maintenance Garage.
15      We had all the employees come in the office
16  and it was discussed then.
17      There was a possibility, basically it was
18  not even a possibility of lay-offs.
19      It was a let's-make-an-attempt to try to
20  save, not to have any lay-offs or anything else.
21      That was the idea behind that meeting.
22  Q. So sometime in March?
23  A. Uh-huh.

Page 68

1  Q. Who called the meeting? David Theroux?
2  A. Yes.
3  Q. Called all the employees in?
4  A. Yes.
5  Q. And essentially said there are going to be
6  some budget constraints?
7  A. He said there is a possibility. They are
8  looking at ten to fifteen percent right now. That was
9  a possibility.
10  Q. Was the term lay-offs used?
11  A. He said that was a possibility I am pretty
12  sure.
13  Q. And you are clear that was in March
14  sometime?
15  A. Yes, I think so. If anything, early March.
16  I am not positive of the date.
17  Q. Do you remember when you made your first
18  written complaint to anyone at the City with regard to
19  a sexual harassment complaint?
20  A. I prepared the first complaint or submitted
21  it on April first to Mr. Theroux.
22  Q. That was after your meeting with respect to
23  the budget cuts?

Page 69

1  A. Yes.
2  Q. Did you participate at all in the decision-
3  making process here at city hall with regard to how
4  the budget would be cut?
5  A. I didn't participate in any budget activity
6  at all especially at Central Maintenance. I was
7  totally left out.
8  Q. You never met with the mayor?
9  A. No.
10     I mean yes, I think the 23rd or 27th of June
11 they had a meeting here to explain that there would
12 be -- I think it was basically the Union had set
13 something up for the people that were going to lose
14 their job, half a dozen people that had lost their
15 job.
16 Q. That was after the decision had been made?
17 A. The decision I think was made around the
18 same day. It was a day after or two days after I am
19 pretty sure.
20 Q. But you didn't participate with the mayor's
21 office in any meeting with regard to whether or not
22 there would be a lay-off at Central Maintenance Garage
23 at least up to that meeting?

Page 70

1  A. Correct.
2  Q. Did you participate at all with the Human
3  Resources Department with regard to those decisions?
4  A. No, but I did receive a memo from the
5  mayor's office stating that the preliminary budget
6  information had to be in by April fifth.
7     For some reason I got that in my tray in my
8  mail. The preliminary budget information had to be in
9  by April fifth and meetings would follow afterward to
10 discuss the budget.
11    They were to provide a scenario of a ten
12 percent cut and fifteen percent cut.
13    I was told by Mr. Theroux on April second
14 that the way it stood with a ten or fifteen percent
15 cut there would be no lay-offs.
16 Q. Did your job description include the
17 preparation of the budget for the Central Maintenance
18 Garage?
19 A. I don't remember to be positive, I don't
20 think so.
21    To be honest with you I don't think so.
22 Q. Did you understand that to be Mr. Theroux's
23 job?

Page 71

1  A. Yes, Mr. Theroux and Mrs. Cardin worked on
2  it for a couple of weeks.
3     There was a lot of problems with the books.
4  In fact my complaint was written I think on the 28th.
5  Q. Of?
6  A. April.
7     Mr. Theroux left early those days to go home
8  and work on the budget. I offered to help, but I was
9  told no help was needed.
10 Q. You mentioned in count ten of your
11 complaint that you were the subject of handicapped
12 discrimination.
13    Can you tell me what your handicap was at
14 the time?
15 A. Seizure disorder.
16 Q. Have you treated with any doctors since,
17 I guess since January of 02 other than Doctors
18 Koppleman and Doctor Sullivan?
19 A. Yes.
20    It see Doctor Lesser now.
21    She is a not a psychiatrist, but she is a, I
22 guess a case worker or social worker. She is a
23 doctor, but I have, I am not sure what her title is.

Page 72

1     I see her on a monthly basis. For a long
2  time it was every two weeks. I was having a lot of
3  problems with anxiety.
4     She said I had PTSD. She also said I was
5  depressed and I am on Lexapro and also Clonopin to try
6  to sleep, and recently I started to sleep a little
7  better.
8  Q. Had you ever consulted anyone from her
9  discipline before?
10 A. No.
11 Q. Have you ever consulted a psychiatrist
12 before?
13 A. Never.
14 Q. Or psychologist?
15 A. No.
16 Q. Where is Doctor Lesser's office?
17 A. In Holyoke, on Main Street.
18 Q. Main Street in Holyoke?
19 A. I think it is the Chertoff Building, which
20 is across from the old Providence Hospital.
21 Q. What is her first name?
22 A. Joan.
23    MR. BLACK: I think we gave you the

Page 117

1  A. Yes.
2  Q. I don't remember exactly, did you also
3  discuss the sexual harassment?
4  A. Yes.
5  Q. After that time or I understand at that
6  time you discussed possibly filing a complaint or he
7  suggested somehow --
8      What was your recollection?
9  A. Yes, I came in, we talked. I asked him
10 what I could do about my problem, do I go back to
11 work.
12     I had been out of work for six, seven days.
13 Those were the first days I was out.
14     We talked about the situation down there. I
15 asked him what he thought I should do, and he said
16 well, in order to start any kind of investigation, you
17 have to fill out a complaint.
18     I asked him if I could take the complaint
19 home and think about it. I was worried about doing
20 it. I didn't just want to do this.
21     I went home, filled it out, brought it in
22 the next day to his office.
23     I think Mr. Merchant was not there that day.

Page 118

1  He was at a seminar with Mr. Theroux, and the next
2  thing I heard was Friday morning to return my truck
3  and my pager to the Central Maintenance Garage.
4      When I got there, the locks had all been
5  changed.
6  Q. Were you out on disability at that time?
7  A. No, I was out sick.
8  Q. So you were out on sick leave?
9  A. Yes. I was only out seven or eight days.
10 Q. When did you first go out?
11 A. I think it was the 9th of May was my last
12 day I worked.
13 Q. And when were you due to come back?
14 A. At that point my doctor kept me out for ten
15 days and then another ten days when I had a CT scan.
16     They found nodules in my lungs that they
17 were concerned about and the cough was getting worse.
18 So she treated me with antibiotics and wanted me to
19 stay out of work.
20     Plus the fact I was really really upset.
21 Basically I thought I was dying to be honest with
22 you.
23 Q. On the day you found out you were supposed

Page 119

1  to return the truck and keys and pager as well?
2  A. Yes.
3  Q. On that day, how long left did you have on
4  your sick leave?
5  A. I have no idea.
6      I probably had forty days, forty-five days.
7  I must have used it all up because I don't think I got
8  a check at the end. It was probably close. I had a
9  few days left afterwards.
10     I probably had around forty days.
11 Q. From May --
12 A. May 9th I think was my last day.
13 Q. Was there any reason why you thought you
14 should be keeping the City's vehicle and pager?
15 A. Not at all. I just thought it was strange
16 that I was called to bring the truck back and pager,
17 especially because no one else ever used it but me,
18 on such short notice.
19     It was a holiday weekend, and it just seemed
20 to coincide with the fact I filed a complaint.
21     The Friday when I got back and tried to
22 return the truck, the doors were all locked and that
23 was really kind of upsetting.

Page 120

1  Q. What was Mr. Theroux's daily calendar like?
2  Do you remember?
3  A. Mr. Theroux usually came in around 6:30,
4  seven o'clock, sometimes earlier, sometimes later.
5      Generally he would come with a cup of coffee
6  from Dunkin Donut and read the paper and smoke a
7  cigarette.
8      Generally after that he would be in the
9  office and do whatever he did in his office.
10     At about eight or eight fifteen Mrs. Cardin
11 would come in to work, and she would usually get a
12 coffee and head down to his office until about nine
13 o'clock. And then Mr. Theroux generally left for a
14 period of time.
15 Q. How long?
16 A. Maybe an hour, an hour and a half,
17 forty-five minutes.
18     I really couldn't tell you exactly.
19     At that time Mrs. Cardin would come back out
20 to the office and enter the daily work sheets into the
21 computer data base.
22     She'd get on the phone, talk to people and
23 when Mr. Theroux came back, she'd head down to the

Page 125

1 far as the general atmosphere in the garage, I think
2 it got better.
3     They all claimed it did, most of them did.
4  Q. Do you have statements from these people?
5  A. No. This is just from conversations I had
6 with them.
7     It think the reason was they knew what was
8 expected of them. I had a system of putting out
9 reports that would indicate what needed to be done
10 every time, the service that was needed, what had been
11 done in the past.
12    They felt it was a step in the right
13 direction. That was a good thing.
14 Q. Part of your claim though is that your
15 authority was undermined?
16 A. Yes.
17 Q. With the men?
18 A. Yes.
19 Q. So how is that? How does that coincide
20 with you saying that things were improving?
21 A. There was a good atmosphere, except for
22 Jeff Hooper, his ability to walk right around me and
23 go to the secretary or the clerk and get to Mr.

Page 126

1 Theroux to try to control what kind of work he got.
2     If he was upset with the type of work he got
3 that day, he'd talk to Mrs. Cardin, and Mr. Theroux
4 would come out, why does he have to do this, and he'd
5 change things around.
6  Q. Is there anybody else that --
7  A. Mark Boisvere had the ability to come in
8 and talk to Mr. Theroux and pretty much lodged
9 complaints against the kind of work he was getting
10 assigned, and Mr. Theroux would then ask me to give
11 him different work.
12    That happened quite a few times.
13    Mark is, I think is related to Mr. Theroux.
14 I think he is his wife's cousin.
15 Q. Aside from Mr. Hooper and Mr. Boisvere --
16 A. Mr. Hohenberger also did very little work.
17 If you look at the maintenance records, he probably
18 accumulated about thirty-fifty hours of labor a week.
19    He did very little labor. And that was
20 because he is one of the older guys in the shop
21 and he just really didn't have the ability to do any
22 better.
23    Okay. He is now I think working and doing

Page 127

1 my job. I am not sure.
2  Q. How was your authority undermined with
3 respect to Mr. LaBonte?
4  A. Mr. LaBonte was the union steward and had
5 the ability to go into Mr. Theroux's office after
6 every union meeting and sit and talk with Mr. Theroux,
7 and Mr. LaBonte just didn't have to follow the same
8 rules as the rest of the people.
9     If I gave him work, he complained about it.
10 Okay.
11    The other guys all just kind of fell in
12 place, if I needed them, they helped me, a handful of
13 people.
14    A lot of people were very upset that Mrs.
15 Cardin didn't do any work, sat at her computer and
16 played solitaire all day.
17    They could see it. There is windows all
18 around that office and they could see. And it really
19 hurts the morale of the whole place. It made it
20 really difficult to do my job when I tell somebody we
21 need to do this; why do I have to do it if she can
22 play solitaire; why do I have to do it if he doesn't
23 have to.

Page 128

1  Q. Did you find from the conversations with
2 the co-workers that this situation with Debra Cardin
3 had existed even prior to you coming?
4  A. Yes.
5  Q. And what was the substance of those
6 conversations?
7  A. Ronny Ryczek in particular had held a
8 position, he probably was considered the shop foreman
9 before I got there, and his inability to get along
10 with Mrs. Cardin resulted in him being put in the shop
11 and he was very upset about that.
12 Q. Did you have any other conversations about
13 how Ms. Debra Cardin operated?
14 A. Yes.
15 Q. Before you came?
16 A. Yes.
17    Mr. Theroux had said she has a terrible
18 temper and has thrown the phone down the hall at
19 times; she was very difficult to get along. Just put
20 up with it. Don't -- don't let it bother you, I take
21 care of it. You don't have to worry about it.
22    Even though she was under my supervision, I
23 was not allowed to really supervise her.

Page 137

1  A. Yes, I wouldn't know what other meant to be
2  honest with you.
3
4      (Attorney Patryn looking through file.)
5
6  Q. Maybe I'll move on.
7      Would you know of any other situation that
8  was causing you problems beside the work situation?
9  A. No.
10 Q. By April eighth, 2002 did you tell the
11 union representative that the smoking situation had
12 been resolved?
13 A. No.
14    April eighth was that meeting I talked about
15 where he was there and Mrs. Cardin and myself, and
16 they asked me to drop the complaint.
17    I told them if the smoking resolves, then
18 fine, that is all I was asking for.
19 Q. At any point did you think that the smoking
20 situation was resolved while you were still employed
21 there?
22 A. No, no, because the only change was that
23 they would stand down the hall and smoke rather than

Page 138

1  right in my face.
2  Q. This might sound funny: Were you eating
3  peanut products at all during the time?
4  A. No. I know why you are asking.
5  Q. Now, you have testified that you have
6  memory problems?
7  A. Yes.
8  Q. How long have you had these problems?
9  A. Since I started taking Dilantin.
10 Q. Have you been diagnosed with anything in
11 particular having to do with your memory problems?
12 A. No.
13 Q. How do you get around this problem?
14 A. I generally make notes. I document
15 everything. I have to for many years. And I just
16 basically keep notes and try to get myself organized
17 and be efficient.
18 Q. How did you prepare for this deposition?
19    Did you look at any documents, review any
20 documents?
21 A. Yes, I read through some stuff.
22 Q. Did you file a grievance letter with the
23 union in August of 2002?

Page 139

1  A. That was probably when it was.
2  Q. Is there a reason you didn't mention the
3  sexual harassment that you experienced?
4  A. I don't know.
5     I don't know why I would not mention it.
6  Q. Did you want to take a look at that?
7  A. Sure.
8
9     (Witness examining document.)
10
11 Q. Do you recognize this document?
12 A. Uh-huh.
13 Q. Could you review it please?
14 A. Okay.
15    Okay.
16 Q. Is that the grievance you filed with the
17 union?
18 A. Yes.
19 Q. And what date did you file it?
20 A. 8/20.
21 Q. Did you mention the sexual harassment?
22 A. It doesn't look like it is mentioned
23 there.

Page 140

1      MS. PATRYN: I'd like to mark that as
2  an exhibit as well.
3
4      (Defendant's Exhibit No. 3,
       offered and marked.)
5
6  Q. After you saw Doctor Sullivan on June 25th,
7  2002 did you see anybody in the meantime until you saw
8  Doctor Joan Lesser?
9  A. Probably Doctor Koppleman, very likely.
10 Q. Was any situation going on after June 25th,
11 2002 that caused you stress beside your work at CMG,
12 that situation?
13 A. No.
14 Q. Any situation with your family?
15 A. No.
16 Q. Do you understand how the lay-off process
17 works or worked at CMG or did you understand it?
18 A. No, it wasn't explained.
19 Q. What was your impression of how it worked?
20     MR. BLACK: Objection. You can answer.
21 Go ahead.
22     THE WITNESS: I was told that there, the
23 only, the only thing I was told there was a fifty

**Page 141**

1 fifty chance I'd lose my job, and I said how can that
2 be? I have eighteen years of experience, and he said
3 they just delete your position.
4      That is as far as I know.
5  Q. Who told you that?
6  A. Mr. Theroux.
7  Q. What was your understanding of who is the
8 person who would make the decision?
9  A. Mr. Theroux. He was the appointing
10 authority.
11  Q. Is there anyone else that you thought might
12 have an input into the decision?
13  A. Not that I know of.
14  Q. What would you think would be -- well,
15 strike that.
16      On April second, 2002, do you remember that
17 date for any particular reason?
18  A. Yes. That was a day after I filed the
19 complaint for smoking.
20  Q. Just going through the document, correct me
21 if I am wrong, but did you have some experience where
22 you had to go to the hospital, you were driving to the
23 hospital?

**Page 142**

1  A. Yes.
2      I was -- there was a lot of arguments that
3 day about smoking. I drove home, tried to drive home.
4 I was partway home and I had some real serious problem
5 with my arm and the side of my face, so I took the
6 chance and tried to make it to the hospital, but I
7 went to my doctor's office instead because it was
8 closer.
9  Q. The problems that you listed in your answer
10 to interrogatory number two, which you -- if you want
11 to see what I am referring to -- you had made mention
12 that because of the situation with Mr. Theroux and
13 Mrs. Cardin and the smoking situation, your authority
14 was undermined, you were not given the tasks that you
15 were supposed to do or the information, you were not
16 included in meetings and that sort of thing.
17  A. Uh-huh.
18  Q. Did that have any impact on how anyone at
19 the City viewed your job performance?
20  A. Oh I think so, definitely, yes.
21  Q. Do you know of anybody who ever mentioned
22 it or complained?
23  A. No, but there were many times people at the

**Page 143**

1 counter when things would take place, just comments,
2 this guy is an asshole to work with, and all of these
3 people from other departments were standing there and
4 heard this.
5  Q. Other than that you don't know how it
6 impacted, how the City viewed your job performance?
7  A. There was no evaluations or job performance
8 evaluations done, so I don't know of anybody else that
9 knew it other than the people that came in on a daily
10 basis.
11  Q. You mentioned you shared at one point the
12 CMG computer with Debra Cardin?
13  A. For a short period of time, yes.
14  Q. And you also said that you could tell the
15 computer was being used on nights and weekends?
16  A. No, that it not true.
17      What it was, there was a computer in the
18 office right here on which she was working, and I had
19 a computer in here.
20      I was not allowed to use her computer to
21 find parts and maintenance records and all that stuff
22 because -- I don't know why. I was told I could no
23 longer use the computer so we could transfer those

**Page 144**

1 documents to my computer in my office.
2      So when somebody came to the desk, I had to
3 run around the corner and go to my office.
4      My e-mail, I started getting all this
5 pornographic stuff in my e-mail. I was getting them
6 at home, and I looked at the log and people were there
7 late in the day using my computer or my AOL account,
8 not specifically that one, but e-mails were showing up
9 on the computer and I never had a problem before. They
10 went away after about six months.
11  Q. And these e-mails you never had or do you
12 know for sure, do you have evidence or proof that
13 someone from CMG had involvement in that?
14  A. No, not at all. Just the fact they were on
15 there. They don't send that stuff unless somebody is
16 using it.
17  Q. Would you open the e-mail?
18  A. By mistake, and sometimes you can't get out
19 of them.
20  Q. How long have you had Internet access?
21  A. Oh quite a few years.
22  Q. Did it ever strike you not to open e-mails?
23  A. Oh yes, if you could recognize it, but you

Page 149

1 have a digital camera that I used to take photographs
2 of new trucks and we'd blow them up and make them look
3 nice.
4     I did delete that program off of the
5 computer because it was my program.
6  Q. Did you ever keep any personal records or
7 applications beside the digital camera program on the
8 CMG computer?
9  A. No, I don't think so.
10    On Mrs. Cardin's computer when I had access
11 to it, there was a different drive allocation on that
12 computer and it was a lot of her personal records and
13 that kind of thing, but my computer, no.
14  Q. And in answer, in one of your answers to
15 interrogatories you stated that Mrs. Cardin and Mr.
16 Theroux received gifts from local truck dealers and
17 Springfield Mack.
18    How do you know that?
19  A. The guy delivered them one day and I saw
20 them, and Mr. Theroux asked me if I wanted anything
21 out of the catalogue, they just purchased two trucks
22 from Springfield Mack and he asked me if I wanted
23 anything and I did, and he was upset that I paid for

Page 150

1 it.
2  Q. Did you ever report that to anyone?
3  A. Just Mr. Theroux knew about it.
4  Q. You also stated that on February 22nd of
5 2002 Debra Cardin showed you a collection of Valentine
6 cards?
7  A. Yes.
8  Q. How do you know they were from Mr. Theroux?
9  A. Because it said Dave on the bottom of the
10 cards.
11  Q. Did she force you to look at these cards?
12  A. She stuck them in my face and said, see, he
13 can't get rid of me.
14  Q. Were they intimate?
15  A. I just read that one or maybe two. I
16 really didn't read them. They were short, it was --
17 it was intimate, the type of wording. I love you kind
18 of thing.
19  Q. And was this, I love you, or any of the
20 intimate parts, were they preprinted or handwritten?
21  A. Handwritten.
22  Q. How many of these cards did she show you?
23  A. I think just one. But there were a

Page 151

1 handful.
2     She said they were cards she had been
3 collecting for six or seven years I guess.
4  Q. You also claim that Ms. Cardin received
5 overtime when no overtime was worked.
6  A. Uh-huh.
7  Q. How do you know she didn't work?
8  A. Because I did look at the payroll one time.
9 I really didn't have normal access to it, but I just
10 happened to go looking for something on my behalf. I
11 wanted to see how I got paid and the dates just didn't
12 click.
13    There was days that she was not at work, but
14 she was being paid.
15    So I kept track of that, I documented it and
16 there was about two and a half days of work from
17 January to March where she was not at work and she got
18 paid anyways as straight time, not holiday or vacation
19 or sick time.
20  Q. Did you ever bring up the specific
21 instances with Mr. Theroux?
22  A. I don't think so, no.
23  Q. Have you ever been restrained by the

Page 152

1 Belchertown police?
2  A. No. Other than when they came to get me
3 for the first seizure I had and they helped me out of
4 the house.
5  Q. This is kind of a standard question in a
6 lot of depositions:
7     Have you ever been convicted of a
8 misdemeanor in the last five years?
9  A. No.
10  Q. Or a felony in the last ten years?
11  A. No.
12  Q. When did you put -- strike that.
13    When did you notify the CMG or the City you
14 were going to put in for Family Medical Leave Act
15 time?
16  A. I believe a package came, a certified
17 package, sometime in June after I had been noticed
18 that my job was no longer going to be funded, and I
19 don't think I filled out the paperwork.
20  Q. As far as your monetary loss that you claim
21 to have experienced because of this, the drop in
22 income specifically --
23  A. Uh-huh.