FILED
CLERK'S OFFICE
2006 APR 12 P 4:36
U.S.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-30107-KPN

|  |  |
|---|---|
| ALAN BOURBEAU, <br>       Plaintiff, <br><br> v. <br><br> CITY OF CHICOPEE a Municipal Corporation duly established under The laws of the Commonwealth Of Massachusetts, <br><br> DAVID THEROUX In his official Capacity as supervisor of the City of Chicopee's Central Maintenance Garage <br>       Defendants | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN DISPUTE

As required by D. Mass. L. Fed. R. 56.1, the Plaintiff Alan Bourbeau, submits this statement of material facts of records as to which he contends there is a genuine issue to be tried.

1. Plaintiff brought a claim for discrimination pursuant to 42 U.S.C. 2000 and M.G.L. c. 151B before the Massachusetts Commission Against Discrimination (MCAD). (Ex. C) The Commission found insufficient evidence of

1

discrimination, and Plaintiff appealed. (Ex. E) During the pendency of the appeal Plaintiff withdrew his MCAD claim to pursue a civil suit. (Ex. E)

2. Plaintiff alleges repeated incidents of sexual behavior between David Theroux and Debra Cardin. There were seven major incidents, which the defendant alleged he remembered at his deposition, but states that incidents of sexual contact between Theroux and Cardin occurred almost daily. (Ex. A and E F, p. 41-62; and 173-175)

3. The Plaintiff testified to repeated harassment by the other employees because of this conduct between Cardin and Theroux (Ex. F, p. 174)

4. Another, employee, Ronald Ryczek corroborated the Plaintiff's allegations by testifying in his deposition of his seeing reported conduct of inappropriate touching, hugging and kissing to a point of his trying to avoid them. (Ex. H. 11-15)

5. Not only did the Plaintiff witness inappropriate and objectionable conduct between Theroux and Cardin, he was subject to retaliation for complaining about this conduct. (Ex. F. p. 175)

6. This conduct took place when they knew the plaintiff was around and they deliberately engaged in this conduct so that the plaintiff had to see It. (Ex. F. p. 173-175)

7. This conduct continued long after it was made known to the defendant that this sexual conduct bothered the plaintiff. (Ex. A)

8. The plaintiff alleges that Ms. Cardin repeatedly rubbed his back and when he told Theroux about this behavior, he was ignored. (Ex. F. p. 58, 128, 188-89)

9. The plaintiff believed that these confrontations with Ms. Cardin and Mr. Theroux subjected him to harassment and had an impact on how the City viewed his performance. (Ex. F p. 142)

10. Theroux and Cardin denied any intimate sexual relationship but another employee testified that this was going on for all to see. (Ex. H. 11-15)

11. The plaintiff testified that his job was circumvented when he began to complain to Theroux about this activity and about the smoking. (Ex. F. 178-189)

12. The plaintiff also told Theroux about Cardin's activities of touching him and he said to him that this is just the way it is. (Ex. F. 57-58, 62)

13. Mr. Theroux essentially testified that he was aware that smoking was unlawful but he allowed it anyway and he allowed it in front of the defendant even though he was told that it was exacerbating his health issues.

14. Mr. Merchant who was Mr. Theroux's supervisor for the City of Chicopee testified that he conducted an investigation of Mr. Bourbeau's complaints and found discrepancies with Theroux's story. (Ex. G. p. 48; H. p. 30)

15. Mr. Merchant also concluded in his investigation that Theroux and Cardin behaved inappropriately for the workplace. (Ex. H. p. 45)

16. In spite of this fact. Mr. Merchant allowed Theroux to unilaterally decide to terminate the Plaintiff's employment. (Ex. H. p. 45)

11. Mr. Bourbeau was left out of decisions and his job was gradually being ignored because of his complaints. (Ex. F. p. 142, 143)

12. As soon as Mr. Bourbeau presented his complaints to Theroux, his response was that this was a huge mistake and he was told that he had a fifty-fifty chance of being terminated. (Ex. F. p. 142-143)

13. Up until this time he was told that it was Cardin that would be terminated, and not him. (Ex. F. p. 142-143)

12. The Plaintiff was left out of a lot of activities, which should have been his such as not being allowed to go certain functions, not to contact certain parts' suppliers. (Ex. A)

13. Further, Ms. Cardin had special privileges such as being allowed to leave whenever she wanted and was allowed to drive Mr. Theroux's vehicle. (Ex. A)

12. Mr. Bourbeau was not made aware of a truck that come in for service and was yelled at by Theroux. (Ex. A)

13. Mr. Theroux basically had other employees report to Theroux even thought it was Boubeau's job to supervise these employees. (Ex. A)

14. Ms. Cardin was allowed to work less than other employees because of her relationship with Mr. Theroux. (Ex. A)

15. Dr. Koppleman did opine of a causal relationship between the stress at work and his exposure to secondary smoke to a variety of Illnesses Including pneumonia and stress, which could have contributed to the seizures. In her disclosure and in her attached affidavit the following: (Ex. B)

   a. On June 13, 2002 he underwent a CAT Scan of his chest, which revealed single bilateral small pleural nodules. (Ex. B)

   b. She opined that these nodules represented Bronchiectasis Obliterating Organizing Pneumonia, precipitated by his exposure to secondary smoke in combination with a decreased immune status due to stress. (Ex. B)

   c. She further opined that Mr. Bourbeau suffered from PTSD and stress induced depression, which in her medical opinion was directly and causally related to the stress at work. (Ex. B)

   d. She further opined that with the increased stress at work, Mr. Bureau began to experience Increased neurological activity causing complaints of intermittent problems with uncontrollable tonic arm activity, loss of concentration and memory lapses and an Increased occurrence of migraine headaches. (Ex. B)

   e. She further opined that in her medical opinion that It Is the plaintiff's neurological manifestations of stress, presented as an Increase In seizure activity most probably caused not limited to episodes of hypoxemia. (Ex. B)

   f. She also opined that the plaintiff was suffering with increased gastoesophageal reflux problems as a response to the stress. (Ex. B)

   g. Dr. Koppleman never stated in her note attached as defendants' exhibit K that there was no causal connection between the smoking and the seizure symptoms. (Defendant's Ex. K) The "not likely" (If that is what it

says) was clearly referring to something else and not the seizures. (Defendant's Ex. K)

16. The Plaintiff avers in his affidavit that he attended a June 27th 2002 meeting with the Mayor who stated in person that the budget cuts were approximately 3 1/2 per cent across the board. (Ex. A; F. p. 69)

17. This meeting was with the six people what had lost their jobs. Out of these six people only the defendant permanently lost his job. (Ex. A; F. p. 69) Four of the six got their jobs back and one retired. (Ex. A)

18. The allegations in plaintiff's complaint stated that the City of Chicopee did not have a valid nondiscriminatory basis for eliminating his position; it was an excuse to get rid of the Plaintiff because of his complaints. (Ex. C)

18. The defendant's position was official terminated on June 30 of 2002 (G. p. 30) and acts of discrimination including the firing continued up until May 27, 2002 when he was locked out of his office and place of employment. (Ex. A; D)

19. The defendant was officially locked out of his place of business on May 27, 2002 (Ex. A and D) immediately after the defendant filed written complaints and filed his MCAD complaints (Ex. A and D). He was never allowed into his place of business again. (Ex. A and D)

19. Although the defendant's position was not officially filled, the Plaintiff has information that Norman Labonte who is currently hired as a Motor

Equipment Repairman and Is the Union Steward has taken over the actual functions of the plaintiff's job. (Ex. A)

20. Plaintiff's illnesses from the stress at work including his seizure disorder prevented the defendant from sleeping, from writing due to the tremors in arms. (Ex. A; F. p. 178-179) He could not use his CDL license to become a truck driver due to his seizures. (Ex. A) This was one course of employment the defendant was pursuing. (Ex. A)

21. Finally, his sexual relationship with his wife became non-existent due to the stress, the PTSD and the seizures. (Ex. A)

22. On or about June 27, 2000, the plaintiff, Mr. Alan Bourbeau was hired as the Assistant Supervisor the Maintenance for the City of Chicopee at the Central Maintenance Garage. (Ex. A and D)

23. During the second interview, Mr. Bourbeau met his immediate supervisor, the defendant, David Theroux, the supervisor of the Central Maintenance Garage. (Ex. A and D)

24. During this interview, Mr. Bourbeau made Mr. Theroux aware of his medical concerns that working near smokers exacerbated a pre-existing seizure disorder and asked for a smoke free work space. (Ex. A and D)

25. This reasonable accommodation was not made by the defendant City of Chicopee, even though the defendant City of Chicopee had a no smoking policy in effect. (Ex. G. p. 32)

7

26. After a year of sharing a small office with two smokers, the plaintiff Mr. Bourbeau complained further that this smoking was exacerbating his seizure disorder and causing him constant throat and lung irritation. (Ex. A and D)

27. Even though the plaintiff City of Chicopee had a no smoking policy, the City never made this reasonable accommodation as the smoking continued. (Ex. A)

28. At Mr. Bourbeau's annual physical on December 6, 2001, Mr. Bourbeau's doctor insisted that he change his work situation due to the stress and the smoke exacerbating Mr. Bourbeau's seizure disorder. (Ex. A and D)

29. By January of 2002, the other employees of the defendant City of Chicopee's maintenance garage continued to smoke and leave cigarettes lit openly flaunting that they were not complying with plaintiff's wishes. (Ex. A and D)

30. Due to the plaintiff's complaints, his working relationship with is fellow co-workers deteriorated. (Ex. F. p. 43, 173, 174, 179-180)

31. During this time period, Mr. Bourbeau was left out of important work meetings, was withheld information necessary to his work and was left out of other work related activities, such as messages were being taken and not given to the plaintiff. (Ex. F. 181-184)

32. On March 15, 2002, Mr. Bourbeau spoke with his supervisor, defendant Mr. Theroux about how this smoking affected his health. (Ex. A and D)

33. Mr. Bourbeau explained that he was experiencing serious lung and throat problems, which were keeping him awake at nights. (Ex. A and D)

34. Plaintiff Mr. Bourbeau related to defendant Mr. Theroux his concerns about how this smoking would affect his seizure disorder, which was becoming worse with the stress and lack of sleep. (Ex. A)

35. Mr. Theroux agreed to meet with Mr. Bourbeau on March 19, 2002 and stated that he would speak to one employee in particular, a Ms. Debra Cardin about the smoking, since she smoked at a work space close in proximity to that of the plaintiff. (Ex. A)

36. Mr. Theroux smoked and allowed other people to smoke in close proximity even though he knew it was in violation of the Chicopee Municipal Policy. (Ex. G. p. 32)

37. Mr. Theroux seemed not to care that this bothered the plaintiff and testified that he was annoyed with the fact that the Plaintiff was complaining about the inappropriate behavior and the smoking. (Ex. G. p. 33)

38. Mr. Theroux never wrote the Plaintiff up in any way for any employee Issues during his period as Plaintiff's supervisor. (Ex. G. p. 34)

39. On April 2, 2002, when Mr. Bourbeau attempted to speak with Mr. Theroux about the smoking situation, Mr. Theroux became very violent, yelling screaming and actually physically advancing towards Mr. Bourbeau. (Ex. A)

40. Another argument occurred later in the day exacerbating Mr. Bourbeau's seizure disorder even further. (Ex. B)

41. Mr. Bourbeau was extremely stressed at this juncture and was experiencing involuntary tremors of his right jaw and right hand. (Ex. B)

42. Mr. Bourbeau's doctor, Dr. Koppleman wrote a note ordering the plaintiff not to go to work from April 3, 2002 to April 8, 2002. (Ex. A)

43. This conduct was pervasive causing the work environment to become hostile and humiliating for the plaintiff, Alan Bourbeau. (Ex. A)

44. This conduct affected the job performance of the plaintiff and altered the conditions of his employment. (Ex. A)

45. This inappropriate conduct such as heavy kissing and touching in an intimate fashion took place in the open where Mr. Bourbeau and others would see. (Ex. A)

46. The result of this relationship was to exclude Mr. Bourbeau and others from interacting with them. (Ex. A)

47. Multiple situations arose where she was given preferential treatment and favors. (Ex. A)

48. This relationship undermined the plaintiff on various different levels, undermining his ability to control an employee, Ms. Cardin who worked under the plaintiff and undermining his ability to have a relationship with his own direct supervisor, the defendant, Mr. Theroux. (Ex. A)

49. At this time, Mr. Bureau went to the physician's office and Dr. Koppleman ordered antibiotics and treatment for pneumonia. (Ex. B)

50. At this time Dr. Koppleman ordered Mr. Bourbeau out of work again. (Ex. B)

51. Mr. Bourbeau notified the defendant Mr. Theroux of this on March 15, 2002. (Ex. A)

52. Dr. Koppleman ordered Mr. Bourbeau out of work until June 10, 2002 due to the increased seizure activity, which was exacerbated by this stressful work environment, and due to his cough. (Ex. B)

53. While Mr. Bourbeau was recovering, the City of Chicopee decided that his position would be deleted even though Mr. Bourbeau worked for the City of Chicopee for 17 years without complaint. (Ex. A)

54. Two letters were written by the City of Chicopee communicating the fact that his position would be deleted to the plaintiff.

55. The preliminary letter was written on June 6, 2002, with a final termination letter written on June 17, 2002. The termination was effective on July 1, 2002. (Ex. A)

56. The City of Chicopee at all times was an employer employing more than fifty people, subjected them to the provisions of the Family and Medical Leave Act. (Ex. A)

57. The Plaintiff was promised recall for 5 years and never received a recall. Frank Hamm told the Plaintiff that a position for a mechanic with the Chicopee Fire Department was created for him. This job was never posted, which is unlawful, and the Plaintiff would have had seniority over Mr. Hamm. (Ex. A)

PLAINTIFF
ALAN BOURBEAU

By: _____
His Attorney
Alan J. Black, Esquire
1383 Main Street
Springfield, MA  01103
(413) 732-5381