UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ALAN BOURBEAU,                         )
           Plaintiff        )
                              )
                              )
        v.                           )     Civil Action No. 04-30107-KPN
                              )
                              )
CITY OF CHICOPEE and                  )
DAVID THEROUX,                        )
           Defendants        )

MEMORANDUM AND ORDER WITH REGARD TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT (Document Nos. 28 and 31)
July 26, 2006

NEIMAN, C.M.J.

     The City of Chicopee ("Chicopee") and David Theroux ("Theroux") (together "Defendants") have each moved for summary judgment with respect to Alan Bourbeau ("Plaintiff")'s multi-faceted employment discrimination complaint.  The complaint raises a variety of claims, to wit, sexual harassment, gender discrimination, emotional distress, a violation of the Family and Medical Leave Act of 1993 ("FMLA"), disability discrimination, and retaliation.  The parties have consented to the jurisdiction of this court pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  For the reasons which follow, Defendants' motions will be allowed in part and denied in part.

I. BACKGROUND

     For summary judgment purposes, the following facts are undisputed and stated in a light most favorable to Plaintiff, the non-moving party.  *See Uncle Henry's, Inc. v. Plaut Consulting Co.*, 399 F.3d 33, 41 (1st Cir. 2005).  Indeed, most of the facts are

taken directly from Plaintiff's complaint which Defendants have incorporated into their summary judgment motions, minus any "legal conclusions or assertions." (See Document No. 29 (Theroux's Facts) ¶ 1; Document No. 33 (Chicopee's Facts) ¶ 1.) Further facts are fleshed out in the court's discussion below.

A. FACTUAL BACKGROUND

On June 27, 2000, Plaintiff, a long-time Chicopee employee, was hired as Assistant Supervisor of Maintenance at the Central Maintenance Garage (hereinafter "the garage"). (Complaint ¶¶ 4, 44.) Plaintiff's work was overseen by Theroux, who held the title of garage Supervisor. (*Id.* ¶ 5.) During his initial interview, Plaintiff told Theroux that working near smokers exacerbated a pre-existing seizure disorder and that he would need a smoke-free workplace. (*Id.* ¶ 6.)

After about a year of sharing a small office with two smokers, Plaintiff complained that their smoking was, in fact, exacerbating his seizure disorder and causing him constant throat and lung irritation. (*Id.* ¶ 6.) Still, Theroux allowed the smoking to continue. (*Id.* ¶ 7.)

On December 6, 2001, Plaintiff's doctor insisted that he change jobs due to the smoking and stress he was experiencing at work. (*Id.* ¶ 8.) By January of 2002, however, employees continued to smoke and leave cigarettes lit. (*Id.* ¶ 9.) When Plaintiff complained, his working relationship with these employees deteriorated. (*Id.* ¶ 10.) As examples, Plaintiff claims that he was left out of important meetings and information necessary to his job was withheld from him. (*Id.* ¶ 11.)

On March 15, 2002, Plaintiff again informed Theroux that the continued smoking was affecting his health, *i.e.*, he was experiencing serious lung and throat problems

2

which were keeping him awake at nights, and his seizure disorder was becoming worse with the stress and lack of sleep. (*Id.* ¶¶ 12-14.) In response, Theroux said he would speak to one particular employee whom Plaintiff supervised, Debra Cardin ("Cardin"), and then meet with Plaintiff the following week. (*Id.* ¶ 15.) At the scheduled time, however, Theroux was "unavailable" and told Plaintiff that Cardin was "hard to get along with" and Plaintiff "would not be able to change her now." (*Id.* ¶ 16.)

On March 29, 2002, Plaintiff directly asked Cardin to stop smoking. (*Id.* ¶ 17.) She goaded Plaintiff to "go ahead and write [her] up" because "Theroux would back [her]." (*Id.*) Theroux did just that: on April 2, 2002, Plaintiff approached Theroux who "became very violent, yelling[,] screaming and actually physically advancing toward" Plaintiff. (*Id.* ¶ 18.) Another argument occurred later in the day which exacerbated Plaintiff's seizure disorder. (*Id.* ¶ 19.) Plaintiff became so stressed from these encounters that he began experiencing involuntary tremors of his right hand and jaw. (*Id.* ¶ 20.) As a result, Plaintiff's doctor wrote a note excusing him from work between April 3 and 8, 2002. (*Id.* ¶ 21.)

During the course of these events, Plaintiff had been witnessing that Theroux and Cardin were having an intimate relationship. (*Id.* ¶ 23.) For example, the two engaged in "heavy kissing and touching in an intimate fashion . . . in the open where [Plaintiff] and others would see" and "grabb[ed] each other below the counter while other employees were in the room." (*Id.* ¶ 27, 33, 34.) Plaintiff's exact allegations from his deposition are discussed below. For present purposes, however, it is undisputed that Plaintiff told Theroux and Cardin that their conduct made him feel "uncomfortable." (*Id.* ¶ 32.) Moreover, Plaintiff claims, the relationship between Theroux and Cardin

3

resulted in Plaintiff being excluded from interacting with either of them, in Cardin not

performing her duties well and spending an unwarranted amount of time in Theroux's

office, in Cardin being given preferential treatment, and in Plaintiff's supervisory control

over Cardin being undermined.  (*Id.* ¶¶ 28-30, 33.)

On May 7, 2002, Theroux returned from vacation and screamed at Plaintiff to "go

home and leave."  (*Id.* ¶ 39.)  Plaintiff immediately went to his doctor who ordered

Plaintiff out of work until June 10, 2002, due to his cough and increased seizure activity

exacerbated by a stressful work environment.  (*Id.* ¶¶ 40, 41, 43.)  Plaintiff notified

Theroux of this on May 15, 2002.  (*Id.* ¶ 42.)

On May 22, 2002, Plaintiff met with Richard Merchant ("Merchant"), a human

resources representative, to try to resolve the issues he was experiencing at work.  (*Id.*

¶ 36.)  Although the two discussed the filing of a complaint (*id.* ¶ 37), it does not appear

that Plaintiff took any formal action at the time.  Two days later, the locks of the garage

were changed (it is not clear by whom), effectively preventing Plaintiff from coming to

work.  (*Id.* ¶ 38.)

While Plaintiff was out of work, "Chicopee" (the parties never say through whom)

decided that Plaintiff's job would be "deleted" and informed him of this by letter dated

June 6, 2002.  (*Id.* ¶¶ 44-46.)  A second letter to Plaintiff, dated June 17, 2002, indicated

that Plaintiff's job would be terminated as of July 1, 2002.  (*Id.* ¶ 46.)  Neither letter has

been provided to the court.

It is undisputed that Plaintiff has been suffering Posttraumatic Stress Disorder

("PTSD") ever since the incidents at work, causing him to experience "distressing

dreams [and] . . . psychological distress at exposure to events that resemble the

traumatic event, diminished interest in activities, feelings of detachment from others, difficulty falling asleep, irritability[,] difficulty concentrating and hyper vigilance." (*Id.* ¶ 52.)  It is also undisputed that Plaintiff has seen both a psychologist and a psychiatrist and has been prescribed medication.  (*Id.* ¶ 53.)

B.  PROCEDURAL BACKGROUND

On August 6, 2002, Plaintiff filed a claim of discrimination with the Massachusetts Commission Against Discrimination ("MCAD").  (Theroux's Facts ¶ 2.)  Although the MCAD initially found insufficient evidence of discrimination, Plaintiff administratively appealed that ruling and thereafter withdrew his claim to pursue this lawsuit.  (*Id.*)

Plaintiff filed the present action on June 4, 2004.  His complaint asserts twelve counts against both Defendants: sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and Mass. Gen. L. ch. 151B ("chapter 151B") (Counts I and II); disparate treatment "sexual" (*i.e.*, gender) discrimination in violation of Title VII and chapter 151B (Counts III and IV); intentional infliction of emotional distress (Count V); negligent infliction of emotional distress (Count VI); an FMLA violation (Count VII); disability discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA") (Counts VIII and IX) and chapter 151B (Counts X and XI); and retaliation in violation of both Title VII and chapter 151B (Count XII).[1]

Presently before the court are Defendants' motions for summary judgment on all

---

[1]  Although several of Plaintiff's counts refer, somewhat curiously, to various provisions of the United States Constitution, he has only pursued the twelve statutory and common law counts enumerated in his complaint.  The court, therefore, considers any constitutional claims to have been abandoned.

counts.  Theroux's motion was filed first and is the most comprehensive.  Chicopee, for

its part, has "incorporate[d] . . . by reference" the issues Theroux raised "that are

identical for both Defendants" and, in addition, has addressed several issues that are

"unique" to it.  (Document No. 32 (Chicopee's Brief) at 1-2.)  The court heard oral

argument on July 6, 2006.

## II.  STANDARD OF REVIEW

"Summary judgment is warranted 'if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to

a judgment as a matter of law.'"  *Uncle Henry's*, 399 F.3d at 41 (quoting Fed. R. Civ.

Pro. 56(c)).  "An issue is 'genuine' for purposes of summary judgment if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party, and a

'material fact' is one which might affect the outcome of the suit under the governing

law."  *Carcieri v. Norton*, 398 F.3d 22, 29 (1st Cir. 2005) (citations and further internal

quotation marks omitted).

## III.  DISCUSSION

Following the parties' lead, the court, after first discussing Theroux's individual

liability, will address Plaintiff's counts in the order they appear in the complaint.  In the

end, the court will allow Theroux's motion for summary judgment in large measure --

*i.e.*, with respect to Counts I through IV, VI through IX and XII (insofar as it alleges Title

VII retaliation) -- but not otherwise.  The court will also allow Chicopee's motion for

summary judgment with respect to Counts I through VII, but not otherwise.

A.  T̲H̲E̲R̲O̲U̲X̲'̲S̲ ̲I̲N̲D̲I̲V̲I̲D̲U̲A̲L̲ ̲L̲I̲A̲B̲I̲L̲I̲T̲Y̲

As an initial matter, Theroux argues that he cannot be sued individually with

respect to the statutory causes of action (Title VII, chapter 151B, the FMLA and the

ADA), but only officially (through Chicopee) in his capacity as Plaintiff's supervisor.

Theroux is only partially correct.

Plaintiff conceded at oral argument that, as this court has recognized previously,

"there is no individual liability under Title VII."  *Horney v. Westfield Gage Co.*, 95 F.

Supp. 2d 29, 33-36 (D. Mass. 2000) (citing cases).  Plaintiff also conceded that there is

no individual liability under the ADA.  *See Wright v. CompUSA, Inc.*, 183 F. Supp. 2d

308, 310 (D. Mass. 2001).  But, Theroux's argument to the contrary, individual liability

does exist under the FMLA and chapter 151B.  *See generally Meara v. Bennett*, 27 F.

Supp. 2d 288 (D. Mass. 1998) (discussing both statutes).  At the very least, therefore,

Theroux's motion for summary judgment will be allowed with respect to Plaintiff's Title

VII and ADA causes of action.  Theroux's other arguments with regard to Plaintiff's

FMLA and chapter 151B claims are addressed below.

B.  S̲E̲X̲U̲A̲L̲ ̲H̲A̲R̲A̲S̲S̲M̲E̲N̲T̲ ̲(̲C̲O̲U̲N̲T̲S̲ ̲I̲ ̲A̲N̲D̲ ̲I̲I̲)̲

The parties' positions with regard to Plaintiff's Title VII and chapter 151B sexual

harassment claims (Counts I and II) can be summarized succinctly.  Defendants assert

that the alleged conduct between Theroux and Cardin to which Plaintiff was exposed

does not meet the standard for sexual harassment, *i.e.*, the conduct was not "sufficiently

severe or pervasive to alter the conditions of [Plaintiff]'s employment and create an

abusive working environment."  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67

(1986) (citation and internal quotation marks omitted).  *See also Cuddyer v. Stop &*

7

*Shop Supermarket Co.*, 750 N.E.2d 928, 937 (Mass. 2001) (similar standard under

chapter 151B) (citations omitted).  As might be expected, Plaintiff asserts that a

reasonable jury could determine that he was sexually harassed.  The court, for its part,

agrees with Defendants that the conduct to which Plaintiff was exposed was not

sufficiently severe or pervasive to create a sexually-hostile working environment.

As District Judge Michael A. Ponsor has observed, the standards applicable to a

Title VII claim charging hostile environment are essentially "analogous" to the standards

under chapter 151B.  *Brissette v. Franklin County Sheriff's Office*, 235 F. Supp. 2d 63,

84 (D. Mass. 2003).  Judge Ponsor's description of those standards, which this court

quotes at length, follows:

[Title VII]

> The Supreme Court has stated that Title VII is
> violated, "[w]hen the workplace is permeated with
> 'discriminatory intimidation, ridicule, and insult,' that is
> 'sufficiently severe or pervasive to alter the conditions of the
> victim's employment and create an abusive work
> environment ...'"  *Harris v. Forklift Systems, Inc.*, 510 U.S.
> 17, 21 (1993) (internal citations omitted), quoting [*Vinson*,
> 477 U.S. at 65 & 67].  In discussing when conduct is
> "sufficiently severe or pervasive," the First Circuit
> emphasized that "[n]ot all offensive conduct is actionable as
> harassment; trivial offenses do not suffice."  *DeNovellis v.
> Shalala*, 124 F.3d 298, 310 (1st Cir. 1997).  As the Supreme
> Court stated in *Harris*, the "sexually objectionable
> environment must be both objectively and subjectively
> offensive" for conduct to rise to the level of actionable sexual
> harassment.  *Faragher v. City of Boca Raton*, 524 U.S. 775,
> 787, citing *Harris*, 510 U.S. at 21-22.  The pervasiveness
> and severity of the conduct is determined by looking at all of
> the circumstances, which include the "frequency of the
> discriminatory conduct; its severity; whether it is physically
> threatening or humiliating, or a mere offensive utterance;
> and whether it unreasonably interferes with an employee's
> work performance."  *Id.* at 787-88, quoting *Harris*, 510 U.S.

8

at 23.

To prevail on a hostile environment claim arising from gender-based discrimination, a plaintiff must show the following:

> (1) that she is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

*O'Rourke v. City of Providence*, 235 F.3d 713, 728 (1st Cir. 2001), citing *Faragher*, 524 U.S. at 787-789.

. . . .

## [Chapter 151B]

The approach taken by the [Massachusetts] Supreme Judicial Court to "hostile environment" claims brought under the state statute does not differ greatly from the Supreme Court's analysis[, *i.e.*,] "[a] hostile work environment is one that is 'pervaded by harassment and abuse, with the resulting intimidation, humiliation, and stigmatization, [and that] poses formidable barriers to the full participation of an individual in the workplace.'" *Cuddyer . . .*, [750 N.E.2d at 937] . . ., quoting *College-Town Div. of Interco, Inc. v. Massachusetts Comm'n Against Discrimination*, 400 Mass. 156, 162, 508 N.E.2d 587 (1987).

For purposes of a hostile environment claim under chapter 151B, sexual harassment is defined in part as "verbal or physical conduct of a sexual nature ... [that] has the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment."

9

Mass. Gen. Laws ch. 151B, § 1(18)(b).

*Brissette*, 235 F. Supp. 2d at 84-86.

Here, the parties all look to Plaintiff's deposition testimony to determine whether the alleged "sexual harassment" was sufficiently severe to survive Defendants' motions. (Although Plaintiff has also submitted an affidavit, that document does not vary materially from his deposition testimony.)  Plaintiff testified at his deposition that, over a two year period, he was forced to witness the embarrassing indicia of an inappropriate relationship between Theroux and Cardin.  For example, Plaintiff described how the two were often "embracing and . . . kiss[ing]" (see Document No. 30 ("Theroux's Brief"), Ex. C ("Pl.'s Depo.") at 41-42); that "there was a lot of touching and back rubbing and that kind of thing[;] . . . somebody had their hands on the other one's rear end or rubbing an arm or that kind of thing" (*id.* at 43-44); that on one occasion "they were both sitting behind his desk talking and their hands were on each other" (*id.* at 46); that on another occasion "Cardin had her hands in [Theroux's] lap and they were kind of looking at each other and smiling" (*id.* at 47); that one time Plaintiff witnessed Theroux "sitting in his chair, [Cardin] was sitting on his desk, and she had her feet on his chair" (*id.* at 50); that Plaintiff later saw Theroux and Cardin "standing up next to the desk" and "[h]e was about to kiss her" (*id.* at 53); and that on one occasion Cardin showed Plaintiff "Valentine's Day cards" from Theroux that were "intimate [but not] explicit," *i.e.*, they said "I love you" or "[w]e will be together someday or something like that" (*id.* at 55-56).

The court is aware of no decision under Title VII or chapter 151B which would extend hostile work environment protection to an employee, like Plaintiff, who simply witnessed such amorous contact between co-workers.  If anything, the weakness of

10

Plaintiff's argument is magnified when viewing his testimony in the context of the caselaw cited by Defendants in which employees *failed* to establish a hostile work environment.  *See Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1366 (10th Cir. 1997) (five incidents of "unpleasant and boorish conduct" directed by supervisor at employee over sixteen month period did not constitute sexual harassment); *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753 (4th Cir. 1996) (male supervisor's alleged sexual harassment of male employee, which included bumping into employee, positioning magnifying glass over employee's crotch, giving employee congratulatory kiss at employee's wedding, staring at employee in bathroom, commenting on employee's appearance and making inappropriate sexual comments, was not sufficiently severe or pervasive to create objectively hostile or abusive work environment within meaning of Title VII, where alleged incidents occurred intermittently over seven-year period); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 431 (7th Cir. 1995) (following incidents spread over seven months did not constitute sexual harassment: supervisor called employee "pretty girl"; once, when employee was wearing leather skirt, supervisor made grunting sound that sounded like "um um um"; once when employee commented on how hot his office was, supervisor raised his eyebrows and said "Not until you stepped your foot in here"; once when announcement "May I have your attention" was broadcast over public address system, supervisor said "You know what that means, don't you? All pretty girls run around naked"; and when employee asked supervisor whether he had gotten his wife Valentine's Day card, supervisor responded that he should because it was lonely in his hotel room and all he had for company was his pillow and then supervisor looked ostentatiously at his hand

11

and gesture was intended to suggest masturbation); *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 534 (7th Cir. 1993) (supervisor's misconduct during two separate sexual advances and alleged retaliation after advances were rebuffed did not create hostile work environment); *Morgan v. Mass. Gen. Hosp.*, 901 F.2d 186, 192 (1st Cir. 1990) (hostile work environment did not exist where plaintiff alleged only that co-worker stood behind him and bumped him, looked at his "privates" in the restroom, "hung around him a lot," and asked him to dance at Christmas party).

Perhaps more importantly for present purposes, the above cases were brought by the individual who was directly targeted by the alleged harasser not, as is the situation here, by a worker significantly removed from the events, *i.e.*, one who simply witnessed another couple's amorous relationship. That distinction looms large. *See McPhaul v. Madison County Bd. of Comm'rs*, 226 F.3d 558, 567 (7th Cir. 2000) ("When . . . harassment is directed at someone other than the plaintiff, the impact of such second hand harassment is obviously not as great as the impact of harassment directed at the plaintiff.") (upholding summary judgment to employer) (citation and internal quotation marks omitted). And even assuming that Plaintiff would theoretically be able to recover for witnessing Theroux's "harassment" of Cardin (or perhaps Cardin's "harassment" of Theroux), *cf. Leibovitz v. New York City Transit Auth.*, 252 F.3d 179, 190 (2d Cir. 2001) ("evidence of harassment directed at other co-workers can be relevant to an employee's own claim of hostile work environment discrimination"), no one has suggested that Cardin (or Theroux) ever considered herself (or himself) to be the victim of a hostile work environment. *See O'Rourke*, 235 F.3d at 728 (actionable harassment requires the victim to subjectively believe the environment to be hostile or

12

abusive).

It is thus clear that the second-hand conduct to which Plaintiff was allegedly exposed -- albeit inappropriate and, perhaps, adulterous[2] -- was not sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and create an abusive work environment under either Title VII or chapter 151B.  Since no reasonable jury court could conclude that Plaintiff himself was sexually harassed, Defendants' motions for summary judgment with respect to Counts I and II will be allowed.

C.  GENDER DISCRIMINATION (COUNTS III AND IV)

In the court's opinion, Plaintiff's claims of gender discrimination (Counts III and IV) are as weak as his sexual harassment claims.  Accordingly, Defendants' motions for summary judgment with respect to these causes of action will be allowed as well.

Employment discrimination claims alleging disparate treatment under Title VII and chapter 151B "ordinarily proceed under the three-step, burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and further explained in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981), *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993), and *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)."  *Quinones v. Houser Buick*, 436 F.3d 284, 289 (1st Cir. 2006) (footnote omitted).  "First, the plaintiff must make out a prima facie case of discrimination."  *Id.*  "The burden then shifts to the defendant to present a legitimate, non-discriminatory reason, sufficient to raise a genuine issue of material fact as to

---

[2]  At oral argument, it was suggested that both Theroux and Cardin were married at the time of the incidents.  Theroux, it should be noted, denies engaging in any such behavior.  (See Document No. 9 (Theroux's Answer) ¶¶ 24-36.)

whether it discriminated against the employee, for the employment decision." *Id.* "Finally, the burden is placed on the plaintiff to demonstrate that the non-discriminatory reason is mere pretext and that the real reason was discrimination." *Id.* (citations omitted).

Plaintiff's gender discrimination claims falter at the *prima facie* step. Typically, to present a *prima facie* case of disparate treatment discrimination, the employee must show that (1) he is a member of a protected class; (2) he was performing his job at an acceptable level; (3) he suffered an adverse job action; and (4) his employer sought a replacement for him with roughly equivalent qualifications. *See Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 15 (1st Cir. 1994). Here, assuming elements (1) and (2) have been met -- Plaintiff is a man who was performing his job at an acceptable level -- Plaintiff fails to demonstrate that he suffered an adverse employment action, element (3).

In this regard, it is important to note that Plaintiff does not allege that his *firing* was an adverse job action for gender discrimination purposes. Rather, Plaintiff merely suggests that Cardin, but not he, was allowed to use the company car, negotiate with parts suppliers and go to parties. (See Document No. 39, Ex. A ("Pl.'s Aff.") ¶¶ 13, 14.) These are not the kind of employment actions sufficient to sustain a *prima facie* case of disparate treatment gender discrimination. *See, e.g.*, *Wyse v. Summers*, 100 F. Supp. 2d 69, 77 (D. Mass. 2000) (noting that counseling statement is "not an adverse employment action . . . [but] the kind of *de minimis* employment hand-slap which falls beneath the radar screen of Title VII") (citing cases). *See also Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996) (noting that minor job changes "cannot rise

14

to the level of a materially adverse employment action" because "[o]therwise every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of an administrative suit.") (emphasis and citations omitted).

Yet even were the court to assume the existence of an adverse employment action, Plaintiff's gender discrimination claims completely unravel at the third stage of the analytical framework. (Plaintiff never questions Defendants' articulation of non-discriminatory reasons at the second step.) As the First Circuit recently observed in a case originating from this court:

> At the third stage of the *McDonnell Douglas* framework, it becomes the plaintiff's burden to establish that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. At the summary judgment stage, the plaintiff must produce evidence to create a genuine issue of fact with respect to two points: whether the employer's articulated reason for its adverse action was a pretext and whether the real reason was [gender] discrimination.

*Quinones*, 436 F.3d at 289-90 (citations and internal quotation marks omitted). Put differently, "[t]he plaintiff must produce evidence to permit a reasonable jury to conclude both that disparate treatment occurred and that the difference in treatment was because of [gender]." *Id.* (citation an internal quotation marks omitted).

Here again, the parties seek the answers to these questions in Plaintiff's deposition testimony. (Like before, Plaintiff's affidavit adds nothing materially new.) As becomes readily apparent, however, Plaintiff's testimony raises no inference whatsoever that, even if disparate treatment occurred, said treatment was "because of" Plaintiff's gender.

At best, Plaintiff testified that he was kept out of the loop and treated somewhat

15

less hospitably than Theroux's paramour, Cardin.  (See, *e.g.*, Pl.'s Depo. at 59 ("I was told that it was not my job to answer the phone, Mrs. Cardin had to answer the phone."), 60 ("We had trucks that were down, and [Cardin] would take the call and not tell me."), 61 ("I believe that their relationship prevented [Theroux] from letting me discipline [Cardin] when she didn't do her job.") and 62 ("[Cardin] did basically zero work . . . [a]nd I was told by Mr. Theroux to leave her alone, . . . don't create a problem with her[;] she is the way she is and she is going to stay the way she is.").)  Missing from his testimony, however, is any evidence that such differential treatment was "because of" Plaintiff's gender.  Indeed, Plaintiff concedes that he believed that, in addition to Cardin, *other males* also received preferential treatment from Theroux.  (See *id.* at 125-26 ("Jeff Hooper [was able] to walk right around me and go to the secretary or the clerk and get to Mr. Theroux to try to control what kind of work he got."), 126 ("Mark Boisvere had the ability to come in and talk to Mr. Theroux and pretty much lodged complaints against the kind of work he was getting assigned, and Mr. Theroux would then ask me to give him different work.", 126-27 ("Mr. Hohenberger also did very little work. . . . He is now I think working and doing my job.") and 127 ("Mr. LaBonte was the union steward and had the ability to go into Mr. Theroux's office after every union meeting and sit and talk with Mr. Theroux, and Mr. LaBonte just didn't have to follow the same rules as the rest of the people.").)  That acknowledgment obviously eviscerates Plaintiff's claim.

In short, even assuming the existence of a cognizable adverse employment action, Plaintiff is unable to prove that he was treated differently "because of" his gender.  Accordingly, Defendants' motions for summary judgment with respect to Counts III and IV will be allowed.

16

D. INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (COUNTS V AND VI)

At oral argument, Plaintiff acceded to the entry of summary judgment in

Defendants' favor with respect to his claim of *negligent* infliction of emotional distress

(Count VI).  Plaintiff also assented in his papers to the entry of summary judgment in

favor of Chicopee, but not Theroux, on his claim of *intentional* infliction of emotional

distress (Count V).  Now before the court, therefore, is Theroux's three arguments why

he, too, is entitled to summary judgment on the intentional infliction claim: (1) the claim

is barred by the "exclusivity" of chapter 151B; (2) the Massachusetts Workers'

Compensation Act, Mass. Gen. L. ch. 152 (the "WCA" or "chapter 152") provides

Plaintiff's exclusive remedy; and (3) the claim fails on its merits.  After discussing each

argument, the court will conclude that Plaintiff's intentional infliction claim against

Theroux survives.

### 1. Chapter 151B Exclusivity

At the outset, the court rejects Theroux's assertion that Plaintiff's intentional

infliction of emotional distress claim is barred by chapter 151B's so-called "exclusivity"

provision.  Simply put, the Supreme Judicial Court has held to the contrary.  *See, e.g.,*

*Green v. Wyman-Gordon Co.*, 664 N.E.2d 808, 813 (Mass. 1996) (noting that claim for

intentional infliction of emotional distress is not barred by chapter 151B).  *See also*

*Foley v. Proctor & Gamble Distrib. Co.*, 2003 WL 21696544, at *4 (D. Mass. July 21,

2003) ("[C]auses of action . . . such as intentional infliction of emotional distress, which

existed before the adoption of Chapter 151B, are not barred by its exclusivity

provisions.") (citing *Chapin v. Univ. of Mass.*, 977 F. Supp. 72, 83 (D. Mass. 1997)).

### 2. Chapter 152 Exclusivity

17

Theroux next argues that Plaintiff's intentional infliction claim is barred by chapter 152's own exclusivity provisions. Although this is a closer question, the court again disagrees.

As Theroux notes, the WCA provides an "exclusive remedy against coemployees who engage in tortious conduct within the course of their employment and in furtherance of the employer's interest." *Brown v. Nutter, McClennen & Fish*, 696 N.E.2d 953, 956 (Mass. App. Ct. 1998). However, "[c]ommon law actions are barred [by the WCA] only where: the plaintiff is shown to be an employee; his condition is shown to be a 'personal injury' within the meaning of the [WCA]; and the injury is shown to have arisen 'out of and in the course of . . . employment.'" *Green*, 664 N.E.2d at 813 (quoting Mass. Gen. L. ch. 152, § 26).

As District Judge Rya W. Zobel has observed, "[i]ntentional torts which are 'in no way within the scope of employment furthering the interests of the employer' are not barred by the [WCA] because they are not an accepted risk of doing business." *Foley*, 2003 WL 21696544, at *4 (quoting *O'Connell v. Chasdi*, 511 N.E.2d 349, 351-52 (Mass. 1987)). In this vein, Judge Ponsor has held that a claim for intentional infliction of emotional distress stemming from sexual harassment was not related to the employer's interest and, therefore, not barred by the WCA. *Morehouse v. Berkshire Gas Co.*, 989 F. Supp. 54, 65 (D. Mass. 1997). *See also Foley*, 2003 WL 21696544, at *4 (citing Morehouse with approval). *But see Green*, 664 N.E.2d at 814 (finding that plaintiff's intentional infliction of emotional distress claim stemming from on-the-job sexual harassment is barred by the WCA).

It is true, as discussed above, that Plaintiff's claims of sexual harassment are too

18

weak to survive independently.  However, as Plaintiff noted at oral argument, his intentional infliction claim is based on more than the sexually hostile work environment to which he was allegedly exposed.  In the court's estimation, the facts as presently alleged bear that out.

Viewing the facts in a light most favorable to Plaintiff, it can be said that Theroux callously dismissed Plaintiff's complaints about second-hand smoke by allowing smoking to continue.  It can also be said that Theroux intentionally left Plaintiff out of important meetings, withheld information necessary to his job, and screamed at Plaintiff on at least several occasions.  To be sure, these activities, assuming for present purposes that they happened, all took place at work.  Nonetheless, paraphrasing Judge Zobel, "any judgment as to [Plaintiff]'s ability to prove *any* set of facts demonstrating that [Theroux] was acting neither within the course of [his] employment nor in furtherance of [his] employer's interest" would appear to be "premature."  *Foley*, 2003 WL 21696544, at *4 (citing *Brown*, 696 N.E.2d at 957) (emphasis added).  *Cf. Horney*, 95 F. Supp. 2d at 37 (allowing emotional distress claims to survive Rule 12(b)(6) motion to dismiss since there was "not yet enough information to determine whether both [the defendant] and [the plaintiff] were acting within the course of their employment when the torts allegedly occurred, or if anything they were doing was related to the interests of [their employer]").  Accordingly, Plaintiff's intentional infliction claim against Theroux survives Defendants' WCA exclusivity argument.

3.  Merits

As to the merits of Plaintiff's intentional interference claim against Theroux, the court concludes, Theroux's argument to the contrary, that Plaintiff has raised sufficient

19

facts to survive summary judgment.  To be sure, Plaintiff must prove that his conduct

was "extreme and outrageous."  *See Agis v. Howard Johnson Co.*, 355 N.E.2d 315,

318-19 (Mass. 1976).  However, after reviewing the evidence proffered, the court finds

that there are sufficient facts which, if proven, would allow -- albeit not require -- a

reasonable jury to conclude that Theroux's conduct crossed that boundary.  *See Boyle*

*v. Wenk*, 392 N.E.2d 1053, 1056-57 (Mass. 1979) ("There is an issue for the jury if

reasonable people could differ on whether the conduct is extreme and outrageous.").

*See also Kibbe v. Potter*, 196 F. Supp. 2d 48, 72 (D. Mass. 2002) (denying summary

judgment where reasonable jury could conclude defendant's conduct was extreme and

outrageous).  For example, Theroux's intentional actions with regard to smoking and

Plaintiff's seizure disorder may have been found to have caused Plaintiff to suffer

severe stress and other serious health issues.  Theroux's alleged screaming was also

obviously harmful as well.  And there is no dispute, at least for summary judgment

purposes, that, ever since the incidents at work, Plaintiff has been suffering PTSD, has

exhibited many symptoms of distress and has seen both a psychologist and a

psychiatrist and has been prescribed medication.

    As the Supreme Judicial Court has explained, "[f]rom their own experience jurors

are aware of the extent and character of the disagreeable emotions that may result from

the defendant's conduct."  *Agis*, 355 N.E.2d at 318.  Jurors will also be able to make

common sense judgments, from the totality of the circumstances, about what action is

"extreme and outrageous."  *See id.* at 319.  *Accord Fletcher v. Szostkiewicz*, 190 F.

Supp. 2d 217, 231 (D. Mass. 2002) (citations omitted).  The Fourth Circuit expressed

similar sentiments over one-half century ago:

> It is only where it is perfectly clear that there are no issues in the case that a summary judgment is proper.  Even in cases where the judge is of the opinion that he will have to direct a verdict for one party or the other on the issues that have been raised, he should ordinarily hear the evidence and direct the verdict rather than attempt to try the case in advance on a motion for summary judgment, which was never intended to enable parties to evade jury trials or have the judge weigh evidence in advance of its being presented.

*Pierce v. Ford Motor Co.*, 190 F.2d 910, 915 (4th Cir. 1951).  Mindful of these principles and the summary judgment facts Plaintiff has alleged, the court will deny Theroux's motion with respect to Count V.

E.  FMLA (COUNT VII)

The FMLA entitles eligible employees who are unable to perform their job functions because of a serious health condition -- which Plaintiff purportedly has -- to twelve weeks of leave.  *See* 29 U.S.C. § 2612(a)(1)(D).  Defendants argue, however, that Plaintiff's rights under the FMLA were never triggered because he failed to complete his FMLA request forms and, hence, never put them on notice of his intent to take FMLA leave.  Plaintiff concedes that he failed to complete the forms but asserts that doing so was unnecessary because he was terminated *after* he requested and received the forms.  Such conduct on Defendant's part, Plaintiff argues, constitutes a violation of the FMLA.

Although Plaintiff cites two district court decisions in support of his argument, neither is entirely on point.  In *Washington v. Fort James Operating Co.*, 110 F. Supp. 2d 1325 (D. Or. 2000), for example, the court noted that the FMLA allows an employer to require its employees to medically certify their requested FMLA leave, but "[a]n employer cannot discipline an employee for submitting incomplete certification unless it

21

gives the employee a reasonable opportunity to correct any deficiencies in the certification." *Id.* at 1330. Similarly, in *Sims v. Alameda-Contra Costa Transit Dist.*, 2 F. Supp. 2d 1253 (N.D. Cal. 1998), the court held that an employer could not claim its employee lacked a serious health condition when the employer "did not take the required steps to alert [the employee] that his certification was inadequate or inform him of what he had to do to secure leave." *Id.* at 1267-68. Here, in contrast, the issue is not certification but Plaintiff's invocation of his FMLA rights in the first place.

There is, to be fair, a modicum of support for Plaintiff's position in the FMLA's anti-interference provision, which makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). Arguably, Defendants' purported decision to terminate Plaintiff's employment after he requested FMLA forms violated the statute's anti-interference provision. *Cf.* 29 U.S.C. § 2615(a)(2) (making it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter").

The problem, however, is that the facts as alleged here do not fall within the statute's protection. Although Plaintiff asserts that he was terminated *after* -- and implicitly *because* -- he requested FMLA forms (see Document No. 41 ("Pl.'s Brief") at [19][3]), his Local Rule 56.1 Statement of Material Facts in Dispute (Document No. 40) says nothing of the sort. Moreover, the deposition testimony which both he and

---

[3]  Plaintiff's Brief is actually a "corrected" version of his memorandum of law which he filed on April 14, 2006, two days after the thrice-extended deadline. Since that document is unnumbered, pages references are in brackets.

22

Defendants cite, when read carefully, does not indicate that he *requested* forms or

otherwise put Defendants on notice that he intended to apply for FMLA leave:

> Q.  When did you notify the [garage] or the City you were
> going to put in for Family Medical Leave Act time?
>
> A.  I believe a package came, a certified package, sometime
> in June after I had been noticed that my job was no longer
> going to be funded, and I don't think I filled out the
> paperwork.

(Pl.'s Depo. at 152.)  Without any factual basis for his FMLA claim, therefore, the court

has little choice but to allow Defendants' motions with respect to Count VII.

F.  DISABILITY DISCRIMINATION (COUNTS VIII THROUGH XI)

Counts VIII through XI are Plaintiff's claims of disability discrimination in violation

of the ADA (Counts VIII and IX) and chapter 151B (Counts X and XI).  Defendants'

primary position with respect to all four of these claims is that Plaintiff did not suffer from

a "disability" and, therefore, is unable to sue under these statutes.  Plaintiff,

unsurprisingly, disagrees.  In the court's view, Defendants' arguments are quite strong,

given Plaintiff's deposition testimony, but not strong enough to grant summary judgment

in Defendants' favor (except for the fact, as indicated, that Theroux is not individually

liable under the ADA).

A plaintiff is considered disabled under both the ADA and chapter 151B if he "(A)

[has] a physical or mental impairment that substantially limits one or more of [his] major

life activities . . .; (B) [has] a record of such an impairment; or (C) [is] regarded as having

such an impairment."  42 U.S.C. § 12102(2).  *Accord* Mass. Gen. L. ch. 151B, § 1(17).[4]

---

[4]  Because chapter 151B "tracks the ADA in virtually all respects," *Gillen v. Fallon Ambulance Serv.*, 283 F.3d 11, 20 n.5 (1st Cir. 2002), the court often refers only to ADA

Here, Defendants do not dispute that Plaintiff has a physical impairment, *i.e.*, seizures and/or a seizure disorder.  Defendants argue, however, that these impairments do not substantially limit a major life activity.  Accordingly, they say, Plaintiff is not disabled as a matter of law.

At the outset, Plaintiff's deposition testimony lends strong support for Defendants' focus on Plaintiff's seizure disorder as his physical impairment.  After a lengthy exchange with Theroux's counsel, Plaintiff unequivocally testified that the only condition which "prevented [him] from taking part in any major life activity before [he] left [working for] the City" was his "seizures" and "break-through seizures."  (Pl.'s Depo. at 40.) Similarly, Plaintiff testified that his only chapter 151B "handicap" was his "seizure disorder."  (*Id.* at 71.)

To be sure, Plaintiff asserts in his memorandum of law (albeit without page references to affidavits, deposition testimony, *etc.*) that there is more to his disability discrimination claims than a seizure disorder.  According to Plaintiff:

> Dr. Koppleman under oath has advised us of [Plaintiff]'s tendency to minimize his symptoms and complaints.  The defendant [sic] also has ignored the report and affidavit of Dr. Koppleman who discusses the devastating effects of the defendant's [sic] seizure disorder and other stress related disorders.  It has always been part of the plaintiff's case that both [sic] the seizure disorder, the lung issues and the posttraumatic stress and depression disorders constituted disabilities under the ADA.

(Plaintiff's Brief at [20].)  Unfortunately, it is virtually impossible to test these proffers, made as they are in Plaintiff's memorandum of law, against the affidavits and other

standards.

documents he attaches.[5]  Still, the court's frustration aside, Defendants appear to

concede, as indicated, that Plaintiff's seizures or seizure disorder are "physical

impairments."  *See* 29 C.F.R. § 1630.2(h)(1) (2006) (defining "physical impairment"

broadly, in pertinent part, as "[a]ny physiological disorder, or condition . . . affecting one

or more of the following body systems: neurological [or] musculoskeletal").

That being the case, the court moves on to Defendants' central argument,

namely, that Plaintiff cannot demonstrate that his physical impairments -- whatever they

may be -- substantially limit a "major life activity."  Again, Defendants focus on Plaintiff's

deposition and assert that Plaintiff unequivocally testified that the "only" activity he could

not perform as a result of his physical impairments was "driving" for a period of six

months (ending in January of 2001).  (Pl.'s Depo. at 17-19.)  In other words, it appears

that Defendants are arguing -- albeit not particularly clearly -- that an inability to drive for

a six month period does not constitute a major life activity as a matter of law.

There is emerging case law to support this position.  For one thing, the legal

trend appears to be that driving is *not* a major life activity.  *See, e.g.*, *Tebo v. Potter*, 345

F. Supp. 2d 61, 67 (D. Mass. 2004) (citing cases).  *See also Guzman-Rosario v. United*

*Parcel Serv.*, 397 F.3d 6, 11 & n.4 (1st Cir. 2005) (observing that it is "unclear" whether

driving is a major life activity).  The First Circuit has also recently noted that impairments

of short duration -- *e.g.*, up to six months -- are likely not disabilities under the ADA and,

---

[5]  As one colleague recently put it, "[i]n practice, most judges subscribe to the
philosophy that they are not like pigs hunting for truffles buried in the briefs, *United
States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991), and it is not their responsibility to
research and construct the parties' arguments.  *United States v. Lanzotti*, 199 F.3d 954,
960 (7th Cir. 1999)."  Jeffrey Cole, U.S.M.J., *Lessons Discovered Along the Way*,
Litigation, Spring 2006, at 4.

'[u]ntil the Supreme Court fine-tunes its interpretation, it will be unclear how lower courts should deal with periods between, say, 6 and 24 months." *Guzman-Rosario*, 397 F.3d at 10 (citing, *inter alia*, the Supreme Court's pronouncement in *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198 (2002), that ADA impairments must be "permanent or long term").

This court, however, need decide this particular question because the "major life activities" Plaintiff is allegedly unable to perform are broader than his inability to drive for six months. Plaintiff has averred that his physical impairments prevent him "from sleeping," "from writing" and from "us[ing] [his] CDL license to become a truck driver" and that his "sexual relationship with [his] wife [has become] non-existent." (Pl.'s Aff. ¶¶ 23, 24. See also Pl.'s Depo. at 178 (Ex. F to Document No. 39).)

To be sure, Plaintiff cites no law stating that sleeping, writing, using a truck driver's license, or sex are "major life activities," but Defendants raise no argument to the contrary. Accordingly, the court will assume that at least some of these activities are "major life activities" under the ADA and chapter 151B. *See Arrieta-Colon v. Wal-Mart P.R., Inc.*, 434 F.3d 75, 88 (1st Cir. 2006) ("Under *Bragdon v. Abbott*, 524 U.S. 624, [638-39] (1998), 'reproduction is a major life activity for the purposes of the ADA' and 'reproduction and the sexual dynamics surrounding it are central to the life process itself.'"); *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 21 (1st Cir. 2004) (recognizing sleeping as major life activity); *Farrington v. Bath Iron Works Corp.*, 2003 WL 278172, at *11 (D. Me. Feb. 7, 2003) (noting that "the First Circuit has yet to consider whether reading and writing constitute 'major life activities," but following other courts which so hold that they do) (citing cases).

26

Alternatively, Defendants argue, briefly, that even if Plaintiff is disabled, he cannot, under a *McDonnell Douglas* analysis, prove that Chicopee's non-discriminatory reason for the termination, *i.e.*, an across the board budget cut, was pretextual. That issue, in the court's view, needs to be dealt with on a fuller record at trial. *See Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 54 (1st Cir. 2000) (courts should exercise caution before granting summary judgment for employers on such issues as pretext, motive and intent); *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 167 (1st Cir. 1998) (the reason for the courts' caution is "because of the availability of seemingly neutral rationales under which an employer can hide its discriminatory intent").[6]

For present purposes, the court finds that Plaintiff has raised, albeit barely, a genuine issue of material fact as to whether his termination was a pretext for unlawful disability discrimination. Accordingly, Defendants' motions for summary judgment with respect to Counts VIII through XI will be denied, except that, as indicated, Theroux is not individually liable under the ADA (Counts VIII and X).

---

[6] Defendants also argue that "Plaintiff cannot make out a prima facie case because he cannot produce any evidence that he was replaced by a person outside the protected class with equal or less qualifications was retained." (Theroux's Brief at 34.) But Plaintiff has met that argument with the following assertions: "I was promised recall for a job from the City for five (5) years and never received a recall. Frank Hamm told me that a position for a mechanic with the Chicopee Fire Department was created for him. This job was never posted, which is unlawful, and I would have seniority over him." (Pl.'s Aff. ¶ 52. See also Pl.'s Depo. at 126-27 (Ex. F to Document No. 39) (Plaintiff's testimony that he "think[s]" Hohenberger "is now . . . doing my job.").) Given Plaintiff's assertions, vague as they may be, the court deems it more appropriate to analyze the *prima facie* elements within the context of a trial. *See Williams v. Raytheon Co.*, 220 F.3d 16, 19 (1st Cir. 2000) (observing that *prima facie* showing is typically "not onerous") (citing *Burdine*, 450 U.S. at 253-54).

G.  Retaliation (Count XII)

Defendants next attack Count XII, which claims that Defendants retaliated against Plaintiff in violation of Title VII and chapter 151B.  For the reasons which follow, this count too will survive Defendants' motions for summary judgment, except for Theroux's individual liability under Title VII.

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must prove that (1) he engaged in protected conduct, (2) he suffered an adverse action, and (3) a causal connection exists between the two.  *See Gu v.  Boston Police Dep't*, 312 F.3d 6, 14 (1st Cir. 2002) (Title VII).[7]  The elements are essentially the same for a retaliation claim brought pursuant to chapter 151B.  *See Noviello v. City of Boston*, 398 F.3d 76, 88 (1st Cir. 2005).  Although Defendants assert that these elements cannot be met as a matter of law, Plaintiff, in the court's estimation, has presented sufficient facts as to each.

At the outset, the court notes that Plaintiff and Defendants fall into a discussion about *McDonnell Douglas* and the purported need for Plaintiff to present a *prima facie* case of "discrimination," including a showing that, post-termination, "[P]laintiff's position remained open and the employer continued to seek applicants from persons of

---

[7]  *Gu* actually uses the term "adverse *employment* action."  *Id.*, 312 F.3d at 14 (emphasis added).  The Supreme Court, however, recently expanded the scope of Title VII's anti-retaliation provision "beyond workplace-related or employment-related retaliatory acts and harm."  *Burlington Northern & Santa Fe Ry. v. White*, 126 S. Ct. 2405, 2414 (June 22, 2006).  While that expansion of liability has not been raised as an issue here, this court is still mindful of the Supreme Court's admonishment that Title VII is intended "to provide broad protection from retaliation."  *Id.*

[Plaintiff]'s qualifications."  (Theroux's Brief at 40.  See also Pl.'s Brief at [28-29].[8])  To

be sure, a *McDonnell Douglas* burden-shifting framework is often applied to retaliation

claims.  *See, e.g.*, *McDonough v. City of Quincy*, --- F.3d ---, 2006 WL 1719947, at *5

(1st Cir. June 23, 2006); *Calero-Cerezo*, 355 F.3d at 25.  But the only *prima facie*

elements are the ones cited above: that (1) Plaintiff engaged in protected conduct, (2)

Plaintiff suffered an adverse action, and (3) a causal connection exists between the two.

*See Calero-Cerezo*, 355 F.3d at 25.

Since Defendants have focused on the wrong *prima facie* showing, the court

must assume that Plaintiff has satisfied the *prima facie* elements of discriminatory

retaliation.  In that respect, Defendants themselves essentially concede elements (1)

and (2); they assume for summary judgment purposes that Plaintiff engaged in

protected conduct (he took sick leave) and then suffered adverse actions (*e.g.*, the locks

to the garage were changed and he was terminated).  Element (3) must be assumed, at

least for summary judgment purposes, because the lock-changing and termination took

place almost immediately after Plaintiff went on sick leave.  *See Costello v. Mass.*

*Rehab. Comm'n*, 982 F. Supp. 61, 66 (D. Mass. 1997) (noting that it is well settled in the

First Circuit that a plaintiff can make the causal connection "by showing that the adverse

employment action occurred shortly after the plaintiff engaged in protected activity")

(citing cases).

"Once a *prima facie* case of retaliation is established, the burden shifts to the

---

[8]  Plaintiff confuses the issues further by describing retaliation in the context of "racial discrimination."  (See Pl.'s Brief at [28, 30].)  As far as the court is aware, Plaintiff's race, whatever it is, has never been made an issue in this case.

employer to articulate a legitimate, nondiscriminatory reason for its employment decision. If the employer provides a legitimate reason, the ultimate burden falls on the plaintiff to show that the employer's proffered reason is pretext masking retaliation." *Wright*, 352 F.3d at 478. Here, Defendants assert that Plaintiff's termination was a naturally occurring layoff and that the locks were changed to deal with possible theft. Thus, Defendants maintain, the burden falls on Plaintiff to show that their proffered reasons were pretextual. However, as discussed above in the context of Plaintiff's disability discrimination claims, and similar to the First Circuit's holding in *Wright*, the court believes that the evidence presented by Plaintiff "creates a triable issue of fact" as to whether any adverse action was in fact due to a legitimate reason or whether Defendants' reason or reasons "masked retaliation." *Id.* Accordingly, summary judgment will not enter on Plaintiff's retaliation claims.

H.  Statute of Limitations

In the final three paragraphs of his brief, Theroux makes a statute of limitations argument which seems to focus principally on what Defendants describe as Plaintiff's serial evidence of hostile work environment and/or gender discrimination. *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) ("Each discrete discriminatory act starts a new clock for filing [administrative] charges alleging that act."). Since summary judgment is entering in Defendants' favor on those claims, the court deems the surviving claims -- disability discrimination and retaliation causes of action which appear to have arisen around the time Plaintiff was fired -- to have been timely filed.

IV.  CONCLUSION

For the reasons stated, Theroux's motion for summary judgment is ALLOWED with respect to Counts I through IV, VI through IX and XII (insofar as it alleges Title VII retaliation), but otherwise DENIED; and Chicopee's motion for summary judgment is ALLOWED with respect to Counts I through VII, but otherwise DENIED.  In other words, the only counts which remain for trial are the following:

> Count V (intentional infliction of emotional distress) against Theroux;
>
> Counts VIII and IX (ADA disability discrimination) against Chicopee;
>
> Counts X and XI (chapter 151B disability discrimination) against Theroux and Chicopee;
>
> Count XII (Title VII retaliation) against Chicopee; and
>
> Count XII (chapter 151B retaliation) against Theroux and Chicopee.

The clerk shall schedule a case management conference for the purpose of establishing final pretrial conference and trial dates.

IT IS SO ORDERED.

DATED: July 26, 2006

  /s/ Kenneth P. Neiman   
KENNETH P. NEIMAN
Chief Magistrate Judge